# THE McCALL'S FERRY POWER COMPANY *vs.* ROBERT F. PRICE.

*When Master Liable to Servant for Injury ·Caused by Negligence of Fellow Servant—Negligence of Workman in Charge of Hoisting Engine—Incompetency of Engineer Known to Defendant's Superintendent—Evidence—Instructions—Appeal—Constitutional Provision as to Time of Filing Opinion.*

In an action against an employer to recover damages for an injury caused by the negligence of a fellow servant, the plaintiff must show that such fellow servant was incompetent, and either that the defendant had not used due care in selecting him, or that subsequent to his employment and prior to the injury, the defendant knew, or by the exercise of reasonable care could have known, of his incompetency, and retained him in the service.

For the purpose of carrying sand from a vessel to a railroad car, the defendant erected two poles, one at the railroad track and the other in the water, between which was stretched a cable. A large, iron, clamshell bucket, weighing two thousand pounds, was suspended from the cable and moved by an engine. Plaintiff, a workman, was ordered by the foreman in charge of the works to get on the bucket and shorten the chain attaching it to the cable. While so engaged, the engineer started the engine, raising the bucket with plaintiff on it above the ground, and then let the bucket fall suddenly, so that the plaintiff was thrown off and injured. In an action to recover damages therefor, the plaintiff alleged that the engineer was incompetent and that the defendant company had retained him in its employment after having knowledge of his incompetency. *Held*, that the evidence in the case is sufficient to warrant the jury in finding that the plaintiff's injuries were caused by the negligent act of the engineer in lifting the bucket while the plaintiff was on it.

*Held*, further, that the evidence is legally sufficient to show that the defandant's superintendent in charge of the work had knowledge, prior to this accident, that the engineer was incompetent.

*Held*, further, that a prayer is correct which instructs the jury that the plaintiff is entitled to recover if they find that, while he was at work on the bucket in pursuance of orders of the foreman, it was raised and lowered so as to throw him off and injure him; that the moving of the bucket was due to the negligent act of the engineer in charge of the hoisting engine and was the direct cause of the injury·to the plaintiff; that the engineer was incompetent for the work of operating the hoisting engine, and that his incompetency was known to the defendant's

superintendent prior to the injury to the plaintiff, or by the exercise of ordinary care could have been known.

*Held*, further, that in this prayer it was not necessary to require the jury to find negatively that the bucket was not moved by the counterweight, as alleged by the defendant, since the prayer requires the jury to find positively that the movement of the bucket was caused by the running of the engine.

The knowledge by defendant's superintendent in charge of the work of the incompetentcy of the engineer is imputable to the defendant.

In an action for personal injuries, a prayer instructing the jury that in estimating damages they may take into consideration the plaintiff's capacity for doing work and earning wages prior to the injury as compared with his condition and capacity afterwards is not open to the objection that there is no evidence as to the plaintiff's capacity to earn wages prior to the accident, if there is testimony in the case that before the injury the plaintiff was a very strong man and earned certain wages.

Where the plaintiff's evidence was that he was injured by the negligence of defendant's engineer in charge of a hoisting engine, and that the incompetentcy of the engineer was known to the defendant prior to the injury, the defendant's superintendent was asked, "have you ever put new men to work on hoisting engines?" *Held*, that an objection to this question was properly sustained since any answer thereto would not be relevant to the issue in the case.

*Held*, further, that a witness cannot be asked if the engineer knew anything about running a hoisting engine, since that was a fact to be found by the jury.

When a medical witness, in an action for personal injuries, has testified on cross-examination that nature would improve the plaintiff, he may be asked on re-direct examination: "You think nature will improve him? Is or is not his whole system more susceptible to anything else—will it not surrender more easily to an attack of a disease?"

Although the testimony of a witness as to a part of the conversation he heard may not be admissible, yet, when the whole conversation was afterwards testified to and explained by other witnesses, no reversible error is committed by the refusal to strike out the first testimony.

When one of the questions in the case is whether an iron bucket, which injured plaintiff, was moved by a hoisting engine or by a counterweight, a workman, employed at the place and possessed of a knowledge of hoisting engines and machinery, although not an expert, may be asked whether on that particular day the bucket could have been raised except by a movement of the engine.

In a case where it was alleged that the incompetency of an engineer whose negligence caused the injury complained of was known to the defendant's superintendent, it was shown that the superintendent was

at the place of work every day and most of the time, and that he saw some of the negligent acts of the engineer described by the witnesses, and spoke of his incompetency. *Held*, that under these circumstances, evidence of negligent acts by the engineer prior to plaintiff's injury is admissible, although it is not expressly shown that the superintendent was a witness of them.

*Upon motion for re-argument.*

Constitution, Art. 4, sec. 15, provides that in every case in the Court of Appeals "an opinion in writing shall be filed within three months after the argument or submission of the cause." *Held*, that this provision is directory and not mandatory.

This case was argued on January 15th, 1908. After writing an opinion affirming the judgment appealed against, in conformity with the views of the Court, and which was submitted to the Court, the Judge who wrote the opinion fell ill, and since further consultation in regard to certain questions of fact was desired by the other Judges before filing the opinion, an order of Court was passed *per curiam* on April 9th, affirming the judgment, and on May 19th, 1908, the full opinion in writing was filed in accordance with said order. *Held*, that a motion for re-argument on the ground that the opinion was not filed within three months after the argument of the cause should be overruled.

*Decided per curiam April 9th, 1908. The following opinion was filed May 19th, 1908.*

*Motion for re-argument overruled May 20th, 1908.*

Appeal from the Circuit Court for Talbot County (PEARCE, C. J., ADKINS and CROTHERS, JJ.), where there was a judgment on verdict for the plaintiff for $12,500.

*Plaintiff's 1st Prayer.*—If the jury find from the evidence that on the twenty-third day of August, 1906, the plaintiff, Price, was in the employ of the defendant, The McCall Ferry Power Company, and that the said defendant owned at Port Deposit, Maryland, a plant or certain machinery for unloading sand barges and that in the construction and operation of said plant a considerable number of men were employed, and that for the operation of said plant a hoisting engine with accompanying machinery was placed on top of what is called, in the evidence, the tunnel, and that this engine and certain drums and cables connected therewith constituted the means for the

operating the iron clam-shell bucket referred to in the evidence, then, if the jury shall further find:

1st. That on the said twenty-third day of August, 1906, the said iron bucket was lying open on a railway track constructed over certain cribs placed out in the river to carry said track to the outer crib or landing for the barges used in connection with said plant, and that while said bucket was lying open on said track the plaintiff and one Jesse Price were ordered by one Ackers, a foreman, who was at that time in charge of the work and of the employees at the said plant, to get upon said iron bucket and adjust the chain that connected it with the cable by means of which it was operated by the hoisting engine and that the plaintiff got upon said bucket as ordered and that almost immediately thereafter, while still on said bucket, the said bucket was raised and lowered or moved in such a manner as to throw the said plaintiff off, and in so doing seriously injured him, and the jury shall further find:

2nd. That the raising and lowering or moving of said iron bucket as testified to in the case was due to a negligent and careless act of the engineer, Davis, who was in charge of the hoisting engine, in moving the said iron bucket at the time of the accident, and that said negligence and careless act was the direct cause of the injury to the plaintiff, and the jury shall further find:

3rd. That one Coates, the general superintendent of the said plant of the defendant with full power to employ and discharge workmen such as the engineer to run the said hoisting engine operating the said iron bucket employed and put in charge of said hoisting engine the said engineer Davis, and the jury shall further find:

4th. That the said engineer, Davis, in charge of said hoisting engine, was an incompetent engineer for the work of operating said hoisting engine and said iron bucket and that his incompetency prior to the injury to the plaintiff was known to the said Coates, the general superintendent, or in the exercise of ordinary care could have been known to the said Coates, then their verdict shall be for the plaintiff. (*Granted.*)

*Plaintiff's 2nd Prayer.* If the jury find for the plaintiff in this case, then in estimating the damages they are entitled to take into consideration the plaintiff's state of health and physical condition prior to the accident, his capacity for doing work and earning wages prior thereto, as compared with his condition and capacity since the accident in consequence thereof; and they may also consider the question as to whether the injuries will be permanent in their effect, and they may also consider the physical and mental anguish which the plaintiff has suffered in the past, or is likely to continue to suffer in the future, and award him such sum as in their judgment will be an adequate compensation for the injuries which he has sustained.   (*Granted.*)

The cause was argued before Boyd, C. J., Briscoe, Schmucker, Burke, Thomas and Worthington, JJ.

*L. M. Haines* and *Carroll T. Bond* (with whom was *J. C. Mullikin* on the brief), for the appellant:

*J. Harry Covington* and *Omar D. Crothers* (with whom was *Joseph B. Seth* on the brief), for the appellee.

Thomas, J., delivered the opinion of the Court.

The defendant (appellant) was engaged during the summer of 1906, in the erection of a dam across the Susquehanna river, at McCall's Ferry, in Pennsylvania, and in order to secure the sand needed it decided to get it from the Chesapeake bay, and to convey it in scows as far as possible up the river and then by cars to McCall's Ferry. This plan necessitated the devising of some means of transferring the sand from the scows to the cars, and accordingly the defendant sent its superintendent, John B. Coates, to Port Deposit to erect the necessary plant for that purpose. The contrivance finally adopted, and erected under the direction and supervision of Superintendent Coates, at a place called the "lower wharf," in Port Deposit, consisted of two tall poles, called "gin poles," one erected near the railroad track, and the other, not so tall,

on a crib out in deep water.   Between these poles was stretched a cable or "runway," and on this cable was placed a metal block, with various wheels inside of it, to serve as a carriage running along the cable, to which carriage was suspended by chains a "clam shell" bucket, similar to that used on a mud dredge.   From one side of the carriage, and attached thereto, a cable ran to the engine, and from the other side a cable ran to the outer gin pole, and to it was attached what was called a "counter weight."   The engine was located on a tunnel or frame structure sixteen feet high, built over the railroad.   The cable running from the carriage to the engine was attached to the drum of the engine, and by means of this cable the engine pulled the carriage, to which the bucket was attached, along the runway to a point above the tunnel, where the sand was dropped out of the bucket into the car, and when the pressure of the engine was relaxed the counter weight drew the carriage out towards the outer gin pole.   Running from the engine to the carriage, and through it to the bucket, were other cables by which the bucket could be lowered or raised, and opened or closed.   The plan was, by means of the engine and this contrivance, to open the bucket, lower it into the scow loaded with sand, then close the bucket, lift it out of the scow, pull it by the carriage cable to a point above the car, open the bucket, drop the sand in the car, and then by relaxing the pressure of the engine the counter weight would draw the carriage back along the runway out towards the scow again.

In the erection of this plant, which was begun about the 15th of July, 1906, the superintendent employed a foreman, J. N. Acker, and a number of workmen, including the plaintiff (appellee), Robert F. Price.   There was also employed on this work an engineer, Nathan H. Davis, to run the engine. On the 23rd of August, 1906, as the plant was nearing completion, and after the bucket had been suspended from the carriage, and the cables running from the carriage to the engine, and from the carriage to the counter weight, and the several cables running from the engine through the carriage

to the bucket, had been attached, it was found that the chains from the bucket to the carriage were either twisted or too long, and the plaintiff and Jesse Price were ordered by the foreman, Acker, to get on the bucket, which was then lying on the railroad built over one of the cribs, and take the twist out or shorten the chain. In obedience to this order, they got on the bucket, when the bucket was suddenly lifted or moved and fell into one of the cribs and rolled on the plaintiff, seriously injuring him, and to recover for such injury this suit was brought.

The declaration, after alleging that the defendant owned and operated the plant mentioned, and employed the appellee on said works, charges that the defendant "knowingly and negligently employed or knowingly or negligently kept in its employ, a careless, negligent engineer or other servants, whose negligence was unknown to the plaintiff, to operate or run said engine or engines or other machinery connected with said works; that on the 23rd day of August aforesaid, the plaintiff was ordered by the foreman in charge of said works whose orders he was bound to obey, to get upon a bucket which was attached to a cable by means of a chain and shorten the chain attaching the bucket to the cable aforesaid; and in pursuance of said order he got upon the bucket and was proceeding to execute said order, using due care on his part, when the engineer negligently and recklessly started said engine and raised the bucket with the plaintiff on it some distance above the ground or wharf, and then the said engineer without any warning to the plaintiff, recklessly and almost instantly started said engine again and let the bucket fall so suddenly to the ground that the plaintiff was thrown off and crushed beneath it in such manner that he was bruised, wounded and severely and permanently injured, &c." The defendant pleaded *non cul,* and the trial of the case resulted in a verdict for the plaintiff, for $12,500. In the course of the trial the defendant reserved sixteen exceptions, fifteen to the rulings of the Court on the admissibility of evidence and motions to strike out the evidence, and the sixteenth to the

action of the Court on the prayers and the special exceptions of the defendant to the plaintiff's prayer. As the sixth and seventh prayers of the defendant challenge the right of the plaintiff to recover under the pleadings and evidence, and as the questions raised by the rulings of the Court on the prayers may be determined without considering the evidence excepted to, the sixteenth exception will be disposed of first.

There can be no doubt, on the facts of the case, that the plaintiff and the engineer, Davis, were fellow servants, and we do not understand that to be questioned. That being their relation, the action here is one by a servant against the master to recover for injuries alleged to have resulted from the negligence or carelessness of a fellow servant. In such a case the master is not liable for the negligence of a fellow servant, unless it is shown that he was negligent, either in the employment, or in retaining in his service, the servant whose misconduct caused the injury. To entitle the plaintiff to recover in this case it was necessary, therefore, for him to show, first, that his injuries resulted from the negligence or carelessness of the engineer, Davis, secondly, that Davis was not a competent engineer, and thirdly, either that the defendant had not used proper care in selecting Davis as the engineer, or subsequent to his employment and prior to the accident, knew, or by the exercise of reasonable care could have known, of his incompetency, and retained him in its service. *O' Connell* v. *B. & O. R. R. Co.*, 20 Md. 212; *Baltimore Elevator Co.* v, *Neal*, 65 Md. 438; *Baltimore* v. *War*, 77 Md. 593; *Maryland Steel Co.* v. *Marney*, 88 Md. 482; *Maryland Clay Co.* v. *Goodnow*, 95 Md. 330.

(1) The plaintiff testified that he and Jesse Price were ordered by Mr. Acker, the foreman, to get on the bucket, which was lying on the railroad, on one of the cribs, and shorten the chain, and that by the time they got on the bucket the engineer started the engine and raised the bucket about eight or ten feet in the air, and then let it fall with a crash, and it rolled over on him and crushed his side; that Davis was the engineer; that there was no necessity for starting the engine at

that time or for raising the bucket, and that the whole ma-
chinery was operated and controlled by the engine.    Jesse
Price testified that he and the plaintiff were ordered by fore-
man Acker to get on the bucket and shorten the chain, and
that after they got on the bucket the engineer suddenly started
his engine and lifted the bucket eight or ten feet in the air and
then it fell into a crib, and struck or rolled on the plaintiff;
that he saw Davis at the time of the accident, and saw him
start the engine; that the engine was on the tunnel, and that
the engineer was in a position to see them on the bucket, and
that the movements of the bucket were controlled by the en-
gine.    Frank Nicholl testified that they found that the chain
by which the bucket was attached to the carriage was too long
to permit the bucket to go over the side of the boat, and that
the plaintiff and Jesse Price were ordered to get on the bucket
and shorten the chain, that they jumped up to shorten the
chain and while shortening the chain "all of a sudden the
bucket took a quick rise and dropped on this little railroad
and broke a tie and plank;" that the bucket was lying still
when they got on it; that the bucket weighed about two thou-
sand pounds, and that when it fell it rolled on the plaintiff and
injured him; that Davis was at the engine at the time; that
when the plaintiff and Jesse Price got on the bucket witness
looked up to see if Davis was looking, and saw that Davis
was at the engine and had charge of it; that no one signalled
Davis to start the engine, and that there was no warning given
to the plaintiff and Jesse Price that the engine was going to be
started.

This evidence, which was corroborated by the testimony of
other witnesses, describing how the plant worked and how the
movements of the bucket were controlled by the engine, and
by the testimony of foreman Acker, a witness for the defend-
ant, that the bucket was resting on the track when the plain-
tiff and Jesse Price got on it, and that the engine was the only
thing that could have taken it up, was sufficient, in the ab-
sence of a suggestion that the engine was defective, to war-
rant a finding by the jury that the injuries were occasioned

by the engineer negligently and carelessly starting his engine and lifting the bucket while the plaintiff was on it.

(2) The evidence shows that engineer Davis went to work in the construction of this plant about the 15th of July, and was put in charge of the engine used in working the derrick employed in unloading the cars and lifting heavy timbers for the construction of the tunnel and cribs, and the witnesses, Jesse Price, Frank Nicholl, William B. Chesney, John T. Remmie and Creswell, all testified to the manner in which Davis ran the engine between the time of his employment and the day of the accident, when John B. Coates, the superintendent in charge of said work, was present, and to numerous instances during that time when Davis so negligently and carelessly managed the engine that Coates would take him away from the engine and take charge of it himself, stating at the time that he was not competent to run the engine. Nicholl testified that when Davis was running the engine, and they were lifting timbers by means of the engine and derrick, he, Davis, "would snatch it up and he would be at a loss to get it one way or the other and Mr. Coates would drive him away." "It seemed as if Davis would be at a loss to know what to do. He would zig-zag with it. If he got it too high and some one gave him a signal to let it down, it would come down with a thump and wouldn't land in the proper place. When Mr. Coates would take hold of it and handle it;" that Coates would say to Davis, "Damn it, you can't run it," and take the engine himself. Jesse Davis testified, "when we were building the tunnel Mr. Davis was at the engine. In building the tunnel you would have to boom up on the boom and go up on the load together. In hoisting timber lots of times we hoisted two sticks together ten by twelve sixteen feet long. We would put the hook in the centre and carry it up on top. You would have to boom up on your boom and go ahead on your load at the same time to land it on the tunnel, and he on several occasions dropped the load and the boom at the same time. If you'd tell him to boom down the boom and the load was apt to go at the same time." "When he was hoist-

ing timber he would either let the boom fall or the load fall. He didn't know how to control it. He didn't know one lever from the other. I heard Mr. Coates time and time again cuss him from one end of the works to the other because he didn't know how to run the engine and drove him away from the engine and took it himself." "He would get tangled up on his levers." That he heard Mr. Coates say that Davis didn't know anything about running an engine. It would seem unnecessary, and would unduly prolong this opinion, to recite in detail the testimony of the witnesses, Chesney, Remmie and Creswell, which was to the same effect, as to the manner in which Davis managed the engine, and as to the statements of Superintendent Coates that he was incompetent. This evidence was sufficient to show not only that Davis was incompetent, but that his incompetency was known to the defendant prior to the time of the accident. John B. Coates was the superintendent, and had full charge of the work and men at this plant, and it is not questioned in this case, that if he had knowledge of the incompetency of Davis, that knowledge was legally imputable to the defendant. *Baltimore Elevator Co. v. Neal, supra*; *Maryland Steel Co. v. Marney, supra.* There was no error, therefore, in the rejection of the defendant's sixth and seventh prayers.

What we have said in reference to the sixth and seventh prayers of the defendant disposes of all of its special exceptions to the plaintiff's first prayer, except the exception on the ground that there was no evidence that Coates put Davis in charge of the engine. The plaintiff testified that Coates "had full charge of everything, he hired and discharged the men, erected the tunnel, erected the machinery and everything, and had full charge." Mr. Coates testified that he was superintendent, that he sent to the chief engineer and manager of the McCall Ferry Company for an engineer and he sent him Davis, and that he, Coates, employed him. But even if he did not originally employ Davis and put him in charge of the engine, he had, as stated by the plaintiff and not disputed, the right to discharge him, and the plaintiff's right to recover is

based upon the negligence of the defendant, in either his original employment, or his retention in the service of the defendant.

Counsel for the appellant further insist that the plaintiff's first prayer is faulty in that (1) it ignores the testimony of the defendant's witnesses tending to show that the movement of the bucket which caused the injury was caused by the counter weight and not by the running of the engine, and (2) that it does not require the jury to find that the injury was occasioned by the incompetency of Davis. The defendant's theory was that the movement of the bucket was caused by the counter weight, while the theory of the plaintiff was that it was moved by the engine. If the jury found, as they were required to do by the prayer to entitle the plaintiff to recover, that the movement of the bucket was caused by the running of the engine, it necessarily excluded a finding that it was caused by the counter weight, and it was not therefore necessary to negative in the prayer a finding that the bucket was moved by the counter weight. The prayer also requires the jury to find that the injury was occasioned by the negligent and careless act of the engineer; that he was an incompetent engineer, and that his incompetency was, prior to the injury, known to the defendant, or by the exercise of reasonable care could have been known to it (as did the defendant's seventh prayer in *Baltimore Elevator Co.* v. *Neal, supra*, which this Court said "was strictly correct"), and we think properly left to the jury the finding of the cause of the injury, and the other facts necessary for a recovery.

Plaintiff's second prayer was allowed in the case of the *Maryland Steel Co.* v. *Marney, supra*, and the defendant's exception to it, on the ground that there was no evidence to show plaintiff's capacity to earn wages prior to the accident, was properly overruled, as plaintiff and other witnesses testified that prior to the accident he was a very strong man, capa says one of the witnesses, of doing as much work as any man engaged in erecting the plant, and that at the time of the accident he was earning two dollars and fifty cents per day.

The sixth, twelfth and thirteenth exceptions were not pressed in this Court. The question asked in the sixth exception was not answered by the witness, and the questions asked the witness Coates in the twelfth and thirteenth exceptions, viz: "have you ever put new men to work on a hoisting engine?" were properly ruled out, as a responsive answer thereto could not have reflected upon any of the issues in the case. The fourteenth exception was to the refusal of the Court to allow the defendant to ask Acker whether Davis knew anything about running a hoisting engine. This question the jury was required to answer, and there was no error in the refusal of the Court to allow it to be answered by the witness. *Walker* v. *Rogers*, 24 Md. 237. In the fifteenth exception, Dr. Charles T. Davidson testified on cross-examination, in answer to the question of the defendant, "Doesn't nature always improve a condition like that in time—gradually?" replied "this man will improve, nature is going to improve him as far as I can see now, he is not always going to be as he is," and was asked on re-direct examination by the plaintiff, "You think nature will improve him. Is or is not his whole system more susceptible to anything else, will it not surrender more easily to an attack of a disease." This question was not objectionable. It did not elicit from the expert an opinion as to consequences of the injury contingent, speculative and too remote, but was addressed to the present condition of the appellee in consequence of his injuries, and was in response to the answer of the doctor on cross-examination to the question immediately preceding it. The form of the question was intended to direct the Doctor's attention to the preceding question and his answer thereto, and did not violate the rule against leading questions, which may be allowed in the discretion of the trial Court. *Frownfelter* v. *State*, 66 Md. 80; *Stoner* v. *Devilbiss*, 70 Md. 144.

The fourth, fifth and eleventh exceptions are to the refusal of the Court to strike out the testimony of the witness Howlett, relating to a conversation between superintendent Coates and general manager Cooper. The witness was asked whether

he had heard a conversation between Mr. Coates and Mr. Cooper in reference to Davis' capacity as an engineer, and he replied that he "didn't hear the conversation Mr. Coates repeated to him but Mr. Cooper said, 'bring him down from there.'" This testimony amounted to the witness saying that he had heard Mr. Cooper direct Mr. Coates to take Davis away from the engine, but when stated in response to the question asked was calculated to mislead the jury by suggesting that he was removed from the engine because of his incompetency. The conversation, however, as testified to by Mr. Coates, explains the meaning of Mr. Cooper when he told him to bring Davis down from the engine, and that there was nothing said in that conversation about his incompetency and that he was brought from the engine to assist in the work in which the other men were engaged at that time. With this statement of the whole conversation, and the explanation of what was meant by the statement of Mr. Cooper, it was impossible for the jury to have been misled, and the defendant was not injured by the statement of the witness Howlett, and the admission of his testimony would not warrant a reversal. *B. & O. R. R. Co.* v. *State, &c.,* 79 Md. 335.

The first exception was to the ruling of the Court in permitting the witness Nicholl to answer the following question, "Mr. Nicholl, that bucket, could that have been raised on this particular day the accident took place except by the movement of the engine? Was it possible to jerk that bucket up except through the instrumentality of the engine?"

There was no reversible error in permitting that question to be answered. It is true it was not shown that Nicholl was an engineer, but he testified that he had been working around hoisting engines "for the last twelve years" and he had an opportunity to see how they worked. His evidence, as reported in the record, shows that he was an unusually intelligent man for one occupying the position he did. He was in the employ of the appellant and said that on the day of the accident "I was working at various parts of the work, but at that particular time we were adjusting this bucket." On cross-

examination he was examined at length on the subject and explained fully his reasons for the statement he had made in chief. He understood that the weight relied on by the appellant was connected with the bucket, but said it "hadn't got into working order at that time. They were. adjusting it together to see if it was going to work." He also testified on cross-examination as follows: "Q. How do you know that couldn't be raised up without the action of the engine? A. It couldn't possibly fly up in the air. It would have to have power to raise it up. What was going to raise it up? Q. That's what I asked you. A. The engine. Q. Nothing else? A. I don't see how any thing else could. If that bucket was adjusted, when it went over here that would pull it back. The weight would pull it down, but it wouldn't lift it up in the air, would it. Q. That's what I am asking you? A. The weight would bring it this way (indicating) but .it didn't do it. It shot up and shot down and the accident occurred there." So whether he was technically what would be called an expert, he was an intelligent workman accustomed for twelve years to working about hoisting engines and knew enough about machinery and appliances to answer the question objected to. He was corroborated in his opinion by Mr. Acker, the foreman of the work for the defendant, who testified that "the engine would be the only thing to have taken it (the bucket) up." It would be a reproach upon the law to be required to reverse the judgment on account of this evidence of Nicholl alone, if it be conceded to be technically erroneous, but we regard his explanation of what transpired and the test of his knowledge made on cross-examination sufficient to show that there was no error in permitting the question to be asked.

The second, third, seventh, eighth, ninth and tenth exceptions present substantially the same question—whether former acts of carelessness or negligence of the engineer were admissible, the defendant contending that they had not been brought to the attention of the superintendent or any other officer of the company before the accident. Some of these

exceptions were properly overruled by reason of the fact that while one witness relating occurrences was unable to testify that Coates the superintendent of the appellant was present the testimony was supplemented by other witnesses. The evidence showed that Coates was about the works every day and most of the time, and that he not only saw some of the negligent acts of Davis spoken of by the witnesses, but he spoke of his incompetency and at times took the control of the engine from him and ran it himself when Davis had been guilty of negligent acts calculated to do injury to others. The court admitted the evidence with reference to other acts of negligence subject to exceptions, and it was, under the circumstances, clearly the proper course to pursue. It would be very diffcult for each witness to definitely recall whether Coates was present on each and every occasion spoken of, but all of them testified to facts which tended to show that he was present, and in some instances one would remember that he was, while another would say he did not know. The second and third exceptions related to an incident which the witness Chesney spoke of and although he said "I couldn't say that he (Coates) was an eye witness," there was enough in his and other evidence to permit that question to be submitted to the jury.

The seventh and eighth exceptions, as set out in the record, are so general and indefinite that they would not require further comment, but by agreement of counsel the motions intended to be included in the seventh, eighth, ninth and tenth bills of exception were presented by a supplemental record, the motions having been mislaid before the original record was transmitted. The motion in the seventh was to strike out the testimony of the witnesses Remmie and Creswell to an alleged accident or event consisting of a quick stopping of the derrick by the engineer while hoisting and lowering timber, so that the hooks came out and let the timber fall on the ground, that the plaintiff did not prove or offer to prove that knowledge of such accident or event was communicated to the defendant or any of its vice-principals. Even if one of

them had failed to so. testify the motion was necessarily over-ruled, as it involved the evidence of both.   Remmie testified that Coates was present and we think there was sufficient to enable the jury to draw that inference from the testimony of Creswell.    Then the testimony of Creswell shows that Coates was present at the time spoken of about the derrick in the motion embraced in the eighth bill of exceptions.    There was also sufficient in the evidence of these witnesses to go to the jury which tended to show that on the occasions mentioned in the ninth and tenth exceptions Coates was present.    In ad-dition to that the motions were too general and indefinite.    So without meaning to in any wise disturb the rule stated in *Balto. Elevator Co.* v. *Neal,* 65 Md. 452, and other cases cited, we think the evidence in the record is abundantly sufficient to require us to sustain the rulings of the lower Court on the motions presented by the second, third, seventh, eighth, ninth and tenth exceptions, as there can be no doubt Coates occu-pied such a position as to make his knowledge of these negli-gent acts knowledge of the company.

Without further prolonging this opinion our conclusion, after a most careful and thorough consideration of the case, was that there was no reversible error in the rulings of the lower Court and that the judgment must be affirmed in accordance with the *per curiam* order filed on April 9th, 1908.

*Judgment affirmed.*

Upon overruling a motion for a re-argument the following opinion and order of the Court was filed:

A motion for re-argument has been made in this case on the ground that an opinion was not filed within three months after the argument or submission of the cause, as provided in sec. 15, Art. 4 of the Constitution.    That provision is that "in every case an opinion, in writing, shall be filed within three months after the argument or submission of the cause," but notwithstanding the language of the clause is *"in every case"* our predecessors held in *Goverman* v. *Spencer,* 7 Md. 214,

that where the Court was equally divided no opinion should be filed and stated that "In future, in all cases of a divided Court, a similar practice will be pursued." That practice has since been followed. It is true that it was said in *Johns* v. *Johns*, 20 Md. 58, that the Court in *Goverman* v. *Spencer* interpreted "the clause as applicable to cases in which there was a concurrence of a majority of the quorum," and said that it did not overlook the constitutional provision, but it felt at liberty to give the clause the above-mentioned reasonable interpretation, notwithstanding its broad and comprehensive terms.

So in reference to the provision as to time, it would be utterly unreasonable to construe that to be mandatory, especially as such provisions are generally held to be directory. 15 *Ency. of Pl. & Fr.*, 308. Courts should not allow trivial causes to interfere with a compliance with a constitutional or statutory direction, but there may be, as there was in this case, perfectly valid reasons for not technically complying with such requirements as this. So far as we are aware, it has always been the opinion of the members of this Court that the clause is merely directory, and not mandatory, and hence the Court has not hesitated when circumstances required it to file opinions after the three months. It has for example sometimes at its final sittings at the April Term (usually in June) when for some satisfactory reason no opinion had been adopted, affirmed cases by *per curiam* orders, and filed opinions at the following October Term. The object of the constitutional provision is to have prompt decisions of causes, and no one can justly complain of unnecessary delay by this Court in filing opinions and deciding cases before it. It certainly would not be within either the letter or the spirit of this provision to grant a reargument, because an opinion had not been filed within three months—thereby causing further delay.

We hesitate to refer to the reasons for not filing this opinion sooner, and supposed they were understood, but deem it proper in view of this motion to briefly state them. Justice to him requires us to say at the outset that the Judge to whom

the case had been assigned was in no wise responsible for the delay. He prepared the opinion as promptly as the character of the case permitted—involving a great many exceptions, a large record and a judgment for quite a large amount—but before it was adopted by the Court, he was overtaken by a serious illness which required a surgical operation that necessarily prevented him, for the time being, from meeting with the other Judges. While he was still in the hospital, the opinion, which he had written before he was operated on, was sent to the Court, and, although all of us entirely concurred in the law as announced in the opinion, there were some questions of fact which required further communication with him before filing the opinion, as written, or making any alterations in it, as courtesy and the practice of this Court demanded.

After what was perhaps an unusually thorough consideration of the case, we reached the conclusion that the judgment must be affirmed, and in order that the parties might know that conclusion, we filed on April 9th, 1908, a *per curiam* order affirming the judgment, stating that the opinion would thereafter be filed, as has been the practice of this Court, when the circumstances justified and required that course. As soon as we deemed it proper, with due regard to his physical condition, to further communicate with the Judge who had written the opinion we did so, and have now filed it, at what seemed to us to be, under the peculiar conditions, the earliest practicable and proper time. When the *per curiam* order was filed we considered the constitutional provision which immediately follows that above quoted—"and the judgment of the Court shall be final and conclusive"—to be a final disposition of the case, as none of the Judges who sat desired a re-argument, or had any question as to the correctness of the conclusions reached. The motion for re-argument will be overruled.

*Motion for re-argument overruled.*