772 A.2d 1277

**In re ABIAGAIL C.**

**No. 1560, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

May 30, 2001.

Mary J. Pizzo, Asst. Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

C.J. Messerschmidt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for appellee.

Submitted before DAVIS, DEBORAH S. EYLER and PAUL E. ALPERT (Ret'd, Specially Assigned), JJ.

DEBORAH S. EYLER, Judge.

The Circuit Court for Washington County granted a petition for guardianship with right to consent to adoption or long-term care short of adoption filed by the Washington County Department of Social Services ("the Department"), the appellee, with respect to Abiagail C.[1] That ruling terminated the parental rights of Abiagail's natural parents, Chinninia C., the appellant,[2] and Charles L. On appeal, the appellant raises the following questions, which we have rephrased:

I. Did the trial court err in denying her motion to dismiss the Department's petition when there was no ruling by the court within 180 days of the filing of the petition?

II. Was the evidence legally sufficient to support the termination of her parental rights?

For the following reasons, we shall affirm the judgment of the circuit court.

## FACTS AND PROCEEDINGS

On July 31, 1997, following reports that she had been sexually abused by her mother's boyfriend and by Charles L., an adult, the appellant, then thirteen years old, was adjudicated a Child In Need of Assistance ("CINA") and removed from her home. At the time, she was pregnant by Charles L.

During the first four months after being found a CINA, the appellant lived in several foster homes. In each home, she exhibited oppositional behavior, resisting her foster parents' attempts to discipline her and generally having difficulty getting along with them. On October 21, 1997, the appellant

---

1. Throughout the record, Abiagail's name appears sometimes as "Abigail" and sometimes as "Abiagail." Her name is spelled Abigail in the appellant's brief and Abiagail in the appellee's brief. Abiagail appears to be her correct name, so we are using that spelling.

2. Chinninia is the correct spelling of the appellant's name. At some points in the record it is misspelled as "Chinnina."

moved into the foster home of Lisa and David J. She was living there when Abiagail was born, on January 17, 1998.

Before Abiagail's birth, the J.s, like the foster parents preceding them, had found the appellant to be defiant and non-cooperative. She did not follow their rules, would not keep herself clean, dress appropriately, eat or sleep properly (even though she was pregnant), and wanted to "run on the streets" with boys.

After Abiagail was born, the J.s tried to help the appellant learn how to care for the baby, with little success. The appellant became easily frustrated with having to care for an infant. She would shout at Abiagail and one time threw her onto the bed. The J.s had to constantly remind the appellant to feed and change Abiagail. When Abiagail would cry at night, the appellant often ignored her. Because of the appellant's persistent lack of cooperation, the J.s had to intervene to care for Abiagail themselves.

The Department caseworker for the appellant tried to enroll her in parenting skills training classes; that attempt failed because the hours conflicted with the appellant's school hours. In addition, the appellant was not accepted in another parenting program for teenagers because the program was geared to pregnant girls and her baby already had been born. Eventually, the caseworker succeeded in enrolling the appellant in an intensive parenting skills program that was being held from the end of March 1998 to the end of May 1998. The program had a counseling component as well, which the caseworker thought would assist the appellant in getting along with her foster parents.

Unfortunately, although the appellant participated in the two-month parenting program, she continued to neglect Abiagail's needs by failing to consistently provide for her basic care and leaving her unattended and crying for long periods of time. The appellant's caseworker was able to arrange a placement for her and for Abiagail at the Florence Crittendon Group Home, to learn parenting skills and for counseling. They were placed there on June 22, 1998. Six days later, the

appellant left and took Abiagail with her. She complained that the group home was infested with ants.

After spending a day at the home of a friend's boyfriend, the appellant took Abiagail to her mother's house. Shortly thereafter, she returned with Abiagail to the J.s' home, where they remained until December 21, 1998. During that period, there was no change in the appellant's defiant conduct or her inability or unwillingness to care for Abiagail. She continued to fight the J.s' efforts to keep her off the streets. She also continued to ignore Abiagail's most basic needs and to leave her alone and crying for several hours at a time. Finally, after the J.s told the appellant's caseworker they could not cope with the appellant's neglect of Abiagail any longer, the Department removed both the appellant and Abiagail from their home.

The caseworker found a shelter placement for the appellant, but the shelter would not take an infant. The appellant refused to go to the shelter and instead was allowed to return to her mother's home for the holiday. Abiagail was placed in a shelter foster home. When the caseworker found two placements for the appellant and Abiagail together, in early January 1999, the appellant refused both of them. The caseworker then tried without success to identify a family member who could take the appellant and Abiagail. Finally, on January 7, 1999, over the Department's objection, the juvenile court released the appellant from its jurisdiction so she could live with her mother, as she wished to do. Abiagail remained in foster care. She was adjudicated a CINA on January 28, 1999.

Appellant entered into three service agreements with the Department in 1999. On February 27, she entered into an agreement in which she committed to complete a parenting skills course, attend school regularly, find appropriate housing for herself and Abiagail, attend counseling, and interact appropriately with Abiagail during visitation (which had started soon after she had returned to her mother's house in late 1998). By May 1, the appellant had failed to attend counsel-

ing and to complete the parenting program. In addition, although she had attended most of her visitations with Abiagail, they did not go well. At the outset of every visitation session, Abiagail would cry and resist entering the room. At first, she would only enter the room if a foster parent were present; eventually, she would only interact with the appellant in the presence of a foster parent.

On May 1, 1999, the appellant executed a second service agreement with the same provisions as the first agreement. She did not complete her parenting program when that agreement was in effect, however, and did not begin counseling until July 7.

Carlton Munson, Ph.D., a clinical social worker, observed two visits between the appellant and Abiagail, on May 19 and June 16, 1999. During both visits, Abiagail started crying almost the moment that she was left with the appellant and she cried so hard that her face became inflamed. The appellant tried to comfort her, without success; Abiagail would only calm down when her foster mother comforted her. Dr. Munson had only seen such an extreme reaction in three of the other 284 parent/child visitations he had observed.

Dr. Munson performed evaluations of Abiagail and the appellant over the summer of 1999. He found that Abiagail, who by then was 17 months old, was developing normally and that she was shy and very attached to her foster mother. In his evaluation of the appellant, Dr. Munson administered a Parent Stress Index test that revealed a very high stress reaction to parenting, a high measure of dysfunctional interaction with the child, and a perception of the child as being difficult or handicapped. The appellant's score on all three aspects of the test showed an exceptionally high degree of difficulty with her role as a parent. In Dr. Munson's view, this indicated that the appellant would easily become upset with Abiagail and that there would be a significant risk that she would cause Abiagail physical harm. He recommended that Abiagail and the appellant not be reunified until the appellant had complied fully with the service agreement for 9

to 12 months, or longer. He also opined that if Abiagail were returned to the appellant, she would need supportive services and monitoring.

Dr. Munson diagnosed the appellant as having a depressive disorder. Later, she was diagnosed as having bipolar disorder. Apparently, she had been in the depressive cycle of bipolar disorder when she was evaluated by Dr. Munson. The appellant began taking medication for this disorder in July 1999.

After school started in September 1999, the appellant experienced numerous absences, was suspended for three days for fighting, and on several occasions left school early, without permission.

On October 27, the appellant and the Department entered into a third service agreement. She again agreed to attend school regularly, participate in individual therapy, find appropriate housing, and interact properly with Abiagail. She also agreed to make up the parenting classes she had missed and to comply with her psychiatrist's recommendations and medication regimen.

In November 1999, the appellant dropped out of school after numerous absences and a series of disciplinary measures. She failed to attend her therapy sessions regularly or to complete the parenting program. She continued to live with her mother, which was not an appropriate home for Abiagail. The following month, she stopped taking her medication and as a consequence was hospitalized in January 2000. The appellant returned to therapy in February 2000 and continued until April 19, 2000, when she failed to attend two consecutive counseling sessions.

On May 24, 2000, the appellant was adjudicated delinquent after being found involved in two counts of misdemeanor theft. She was placed on probation and ordered into community detention. When she failed to report to her probation officer, she was placed in the Finan Center from May 24 to July 21, 2000. Thereafter, she engaged in family and individual counseling services as part of her probation and received in-home

**578**

intervention services four to five times a week. As of the time of trial, the appellant was scheduled to begin attending an anger management group in late August 2000.

In the meantime, in March 2000, Abiagail was moved from her previous foster home to the foster home of prospective adoptive parents. She adjusted well to her new environment. Abiagail's visitations with the appellant continued, but did not improve. At a visit on June 30, 2000, Abiagail's foster mother attempted for 40 minutes to persuade her to enter the visiting room on her own. When she was taken into the room, she continued to cry and tried to leave.

At the trial on August 17, 2000, the court heard testimony from the following witnesses for the Department: 1) Gary Seligman, M.D., the appellant's psychiatrist; 2) Wendy Pettit, the appellant's social worker from July 7, 1999, until April 19, 2000; 3) Megan Turner, the foster care worker who worked with the appellant and her mother during the CINA proceeding in 1997; 4) Lisa J.; 5) Dr. Munson;. 6) Johnetta Neal, Assistant Principal of South Hagerstown High School (which the appellant attended); 7) John Davidson, another Assistant Principal of South Hagerstown High School; 8) Charles L.; 9) Julie Kreit, the caseworker assigned to Abiagail from December 1998 forward; and 10) the appellant. The appellant also testified on her own behalf, as did Charles L.

The trial court ruled from the bench. It addressed all of the factors in Md.Code Ann. (1984, 1999 Repl.Vol., 2000 Supp.), section 5–313 of the Family Law Article ("FL"), and then granted the Department's petition.

The appellant filed a timely appeal. Charles L. filed an appeal but subsequently dismissed it.[3]

---

3. Charles L. timely noted an appeal on September 12, 2000. Thereafter, on October 24, 2000, he directed his counsel to voluntarily dismiss the appeal. Apparently, his counsel mistakenly filed a motion requesting that the entire appeal be dismissed. The mandate was issued on October 26, 2000. On November 2, 2000, counsel filed a motion to rescind the mandate and reinstate the appeal insofar as the appellant's

## DISCUSSION

### I.

FL § 5–317(d) provides that, "[w]ithin 180 days after a petition for guardianship or petition for adoption is filed under § 5–313 ..., the court shall rule on the petition." The 180-day deadline was not met in this case. The Department filed its petition on February 2, 2000; the case was called for trial 197 days later, on August 17, 2000. The court heard all of the evidence and made its ruling that day.

At the outset of trial, the appellant's lawyer moved to dismiss the petition on the ground that the court had not ruled on it (and could not rule on it) within the time specified in FL § 5–317(d). She argued that notwithstanding that the statute itself does not provide a sanction for non-compliance, its mandatory language, that the court *shall* rule within 180 days of the filing of the petition, necessitated dismissal of the petition. The Department's lawyer responded that the statute does not provide for dismissal as a sanction for the court's failure to rule within the 180–day period and, in any event, such a sanction would run contrary to the legislative purpose of the statute, which is to ensure prompt adjudications of guardianship petitions filed under FL § 5–313.

The court denied the motion to dismiss. In doing so, it made reference to the Department's position (not clearly articulated in the record) that there had been some problem having the case set for trial because one of the Department's case workers was on maternity leave and the Public Defender's Office had had difficulty getting counsel appointed for Charles L. The court ruled, however, that dismissal of the petition was not a required sanction and that the additional 17 days that had elapsed beyond the statutory ruling period had not prejudiced any of the parties.

---

appeal was concerned. That motion was granted on January 11, 2001. As a result, this appeal is taken by the appellant only.

On appeal, the appellant contends that the 180–day ruling requirement of FL § 5–317(d) is in the nature of a statute of limitations that, if not met, mandates dismissal of the guardianship petition; therefore, the trial court erred in denying her motion to dismiss. The Department counters that this is not a sensible reading of the statutory language and does not comport with its purposes.

 Ascertaining the meaning of a statute is a question of law, which we review *de novo*. *Auction of Estate Representatives v. Ashton*, 354 Md. 333, 341, 731 A.2d 441 (1999) (quoting *Calomiris v. Woods*, 353 Md. 425, 434, 727 A.2d 358 (1999)). The primary objective of statutory construction is to determine the true legislative intent. *Board of License Comm'rs v. Toye*, 354 Md. 116, 122, 729 A.2d 407 (1999) (quoting *Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423 (1995)). "Every quest to discover and give effect to the objectives of the legislature begins with the text of the statute." *Huffman v. State*, 356 Md. 622, 628, 741 A.2d 1088 (1999) (citing *In re: Victor B.*, 336 Md. 85, 94, 646 A.2d 1012 (1994)). To do so, we consider the language of the statute, giving the words their ordinary and natural meaning. *Lewis v. State*, 348 Md. 648, 653, 705 A.2d 1128 (1998) (citing *Gardner v. State*, 344 Md. 642, 647–48, 689 A.2d 610 (1997)). We do not read the words of a statute in isolation, however. Instead, we read them with reference to the legislative scheme of which they are a part, and so as to give meaning to the overall legislative intent. We often will examine the legislative history and other sources for a more complete understanding of the legislature's intentions in enacting particular legislation. *Harris v. State*, 331 Md. 137, 146, 626 A.2d 946 (1993). In so doing, "[w]e may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Department of Employment & Training*, 309 Md. 28, 40, 522 A.2d 382 (1987) (citing *Tucker v. Fireman's Fund Ins. Co.*, 308 Md. 69, 517 A.2d 730 (1986); *Bledsoe v. Bledsoe*, 294 Md. 183, 448 A.2d 353 (1982)). Finally, in construing a statute, we "seek[ ] to avoid results which are 'illogical,' 'unreasonable,' or

'inconsistent with common sense.' " *Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1 (1995) (quoting *Tucker*, 308 Md. at 75, 517 A.2d 730, and citing *Kaczorowski v. Mayor and City Council of Baltimore*, 309 Md. 505, 516, 525 A.2d 628 (1987)).

▪▪▪ Depending on the context, placement, and use of the word "shall," and the nature of the constitutional provision or statute in which it appears, the word may have a mandatory connotation, so as to require that the action that "shall" be done must be done, or may be directory in meaning, so as to exhort the doing of the thing that "shall" be done without requiring it. Ordinarily, when the word "shall" is found in a constitutional provision or enactment appearing to impose a duty on the court, it is viewed as directory in meaning. *See McCalls Ferry Power Co. v. Price*, 108 Md. 96, 112–14, 69 A. 832 (1908) (holding that Article IV, section 15 of the Maryland Constitution, stating that the appellate court "shall file" its opinion in a case within three months of argument or submission of the cause, is directory, not mandatory, and that litigant was not entitled to reargument of a case in which an opinion had not been filed within the prescribed time); *see also Maryland St. Bar Ass'n, Inc. v. Hirsch*, 274 Md. 368, 373–74, 335 A.2d 108 (1975) (holding that Article IV, Section 23 of the Maryland Constitution, stating that circuit courts "shall render" their decisions within two months of argument or submission is directory, not mandatory, and that a litigant's due process rights were not violated when an opinion was not filed within the prescribed time); *cf. Resetar v. State Bd.*, 284 Md. 537, 549–50, 399 A.2d 225 (1979) (holding that disciplinary action was not required to be dismissed when board did not rule on it within the time provided by regulation; the regulation did not provide a consequence for the board not ruling within the allotted time and the party had suffered no prejudice).

The appellant acknowledges this principle but attempts to distinguish the 180–day ruling provision in FL § 5–317(d) from other provisions seeming to require court action in a set time frame on the ground that the deadline in FL § 5–317(d)

is tied to the filing date of the petition. She argues that this makes the primary effect of the statute to impose a duty on the Department (as opposed to on the court) to ensure that guardianship petitions are tried and decided within 180 days of filing. Thus, she maintains, FL § 5–317(d) resembles the statutory deadline for bringing criminal prosecutions, addressed in *State v. Hicks*, 285 Md. 310, 403 A.2d 356 (1979), and for filing juvenile delinquency proceedings, addressed in *In re James S.*, 286 Md. 702, 410 A.2d 586 (1980), that are in the nature of finite limitations periods that, when not met, require dismissal.

In *State v. Hicks, supra*, 285 Md. 310, 403 A.2d 356, the Court held that a court rule stating that "a trial date shall be set" no later than 120 days after the appearance or waiver of counsel or the defendant's initial appearance, but not prescribing a sanction for non-compliance, was mandatory and required dismissal for non-compliance, absent an express waiver by the defendant or extraordinary good cause found by the court.[4] In *Hicks*, the Court examined the purpose of the rule and concluded that it was "intended to ... put teeth into a new [statute] governing the assignment of criminal cases for trial." *Id.* at 318, 403 A.2d 356 (referring to Md. Ann.Code art 27, § 591 (1957, 1976 Repl.Vol.), which was enacted by 1971 Md. Laws, ch. 212).

In *James S., supra*, 286 Md. 702, 410 A.2d 586, the Court held that notwithstanding the absence of a sanction in a provision of the Juvenile Delinquency Act stating that a delinquency petition "shall be filed within fifteen days after the receipt of a referral from the intake officer," the required sanction for late filing was dismissal. *Id.* at 713–14, 410 A.2d 586 (analyzing Md.Code Ann. (1974, 1979 Supp.) Cts. & Jud. Proc. § 3–812(b)). Noting the similarity of the operative words of the statute to those of many of the statutes of limitations in the Courts and Judicial Proceedings Article, the

---

4. The rule in question—Rule 746—subsequently was amended to extend the period in question to 180 days and presently appears as Md. Rule 4–271(a).

Court observed, "No one would contend seriously that the language of these limitations statutes is directory rather than mandatory." *Id.; see also In re Anthony R.*, 362 Md. 51, 66–67, 763 A.2d 136 (2000) (holding that amendments to the Juvenile Delinquency Act extending filing time to 30 days and adding a good cause exception did not alter mandatory nature of the statute).

The appellant argues that the rationale behind the holdings in *James S.* and *Hicks,* to "put teeth into" statutes imposing filing and trial deadlines, applies with equal force to guardianship cases filed under FL § 5–313. Specifically, she maintains that some of the evils of the undue passage of time that the trial deadlines at issue in *James S.* and *Hicks,* and most limitations provisions, are designed to eliminate, or at least lessen, also exist in this setting. She points out that for the parent whose constitutional liberty right to raise his or her child is at stake, lengthy pre-trial delays risk impairment of the defense by loss of witnesses and of other evidence and cause anxiety and concern for a prolonged period.

In our view, the analogy the appellant attempts to draw between the respective filing and trial deadlines addressed in *James S.* and *Hicks* and the 180–day ruling deadline in this case does not withstand scrutiny. To begin with, in the context of juvenile delinquency cases, the Court of Appeals has rejected the argument that a rule setting a sixty-day deadline for an adjudicatory hearing is mandatory and requires dismissal for non-compliance. In *In re Keith W.*, 310 Md. 99, 527 A.2d 35 (1987), the Court, noting that the rule in question was virtually identical to the language of the rule in *Hicks,* which had been interpreted to require dismissal, explained that "[t]he considerations in the juvenile context are vastly different from those in the criminal context." *Id.* at 105, 527 A.2d 35. It went on to emphasize that "the overriding goal of Maryland's juvenile statutory scheme is to rehabilitate and treat delinquent juveniles so that they become useful and productive members of society." *Id.* at 106, 527 A.2d 35; *see also In re Dewayne H.*, 290 Md. 401, 405–07, 430 A.2d 76 (1981) (holding that dismissal was not an appropriate

**584**

sanction under a rule stating that juvenile disposition hearings shall be held no later than 30 days after the adjudicatory hearing).

■ We disagree that the 180–day ruling time established in FL 5–317(d) is in the nature of a statute of limitations or a trial deadline, such as those addressed in *James S.* and *Hicks,* and that the legislative purpose underlying the statute would be advanced by the interpretation the appellant suggests.

In 1987, the General Assembly generally revised the adoption and guardianship laws through the enactment of House Bill 590, as chapter 282 of the Laws of Maryland. HB 590 had been introduced "at the behest of the Governor's Task Force To Study Adoption Procedures in Maryland," which had noted in its 1987 Report "the increasing number of children 'drifting' in foster care without any permanent home or family attachment." *In re Adoption No. 93321055,* 344 Md. 458, 482, 687 A.2d 681 (1997). That report documented state-wide statistics showing that on average, it was taking 5.1 years for a child in foster care to be adopted, with figures as high as 7.4 years in Baltimore City. *In re Adoption No. 93321055,* 344 Md. at 482, 687 A.2d 681 (citing GOVERNOR'S TASK FORCE TO STUDY ADOPTION PROCEDURES IN MARYLAND, GROWING UP ALONE: CHILDREN WAITING FOR FAMILIES vii (1987)).

The purpose underlying enactment of some of the measures in the 1987 revisions, such as the amendment providing for deemed consent in the event that a natural parent fails, after proper notice, to object to a petition for guardianship with the right to consent to adoption, was to speed up the guardianship and adoption process so that children no longer would be consigned to foster care limbo for years. *Id.* at 482–83, 687 A.2d 681.[5]

---

**5.** In the same vein, Md. Rule 8–207(b)(5), adopted in 1995, provides that the appellate court's decision in a case involving the guardianship, adoption, or custody of children "shall be rendered within 60 days after oral argument or submission of the appeal on the briefs filed."

FL section 5–317(d) was enacted through House Bill 295 (1991 Md. Laws, chapter 173) as an additional step in the "speeding up" of the adoption and guardianship process, and to some extent because the measures enacted for that purpose in 1987 had proven successful.[6] In its letter supporting HB 295, the Department of Human Resources informed the General Assembly that the recent enactments designed to streamline the guardianship/adoption process had brought about an increase in the number of guardianship cases being filed and, as a result, an increase by almost six months in the average length of time between the filing and disposition of those cases. The Department of Human Resources asked the General Assembly to enact HB 295, "establishing [a] time frame[ ] for the courts to hear these cases ... [to] assist the courts in assigning a higher priority to these cases and thus enable earlier implementation of adoption plans for children." A committee report on HB 295 prepared in conjunction with an identical cross-filed Senate Bill (SB 656) stated that testimony before the Senate was that the bills were "intended to reduce the length of time involved in implementing adoption plans for foster children." Senate Jud. Proc. Comm. Report, House Bill 295 (1991).

The mandatory construction of FL § 5–317(d) urged by the appellant would be at cross-purposes with the stated intention of the General Assembly in enacting it: to reduce as much as practicable the time that children spend in foster care without any permanent home or attachments. To be sure, one of the objectives of this statute and many of the other related laws enacted since 1987 has been to reduce delay in the disposition of guardianship cases, and some of the evils of delay in criminal and delinquency cases likewise exist in this setting. The overarching purpose of this and the other adoption and guardianship statutes, however, is to promote the best interests of children by accelerating the process for getting them

---

6. Other amendments to FL § 5–317(e) were passed in 1992 and again in 1994 for the same purpose. *In re Adoption No. 93321055,* 344 Md. at 483–84, 687 A.2d 681; *see* 1992 Md. Laws, ch. 511; 1994 Md. Laws, ch. 234.

out of foster care and into adoptive families. The primary evil that this statute addresses is not the loss of witnesses' memories or the anxiety that adults experience awaiting critical decisions affecting their lives. It is the loss for the children in foster care limbo of the precious and limited years in which they can become part of a family.

A mandatory construction of FL § 5–317(d) requiring the circuit court to dismiss a guardianship petition that has not been ruled on in 180 days cannot possibly serve that purpose. The consequence of dismissal would not be that the child would be returned to the natural parent by default, as the appellant seems to assume, or that the child would remain adrift in foster care. Rather, the consequence plainly would be that the petition would be refiled and the 180–day period would run anew. *See Scott v. Prince George's County Dep't of Social Servs.*, 76 Md.App. 357, 376–80, 545 A.2d 81 (1988). Thus, only further delay would be accomplished. We will not interpret a statute meant to assist the circuit court in more promptly deciding guardianship/adoption cases so as to delay the dispositions of those very cases. *Cf. McCalls*, 108 Md. at 113, 69 A. 832 (noting that "[i]t certainly would not be within either the letter or spirit of this provision to grant a reargument, because an opinion had not been filed within three months thereby causing further delay.").

## II.

The appellant contends that the evidence was not sufficient to support the trial court's findings that resulted in the termination of her parental rights.

When the State seeks to terminate parental rights without the consent of the parent, the standard is whether the termination of rights would be in the best interest of the child. *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 112, 642 A.2d 201 (1994) (citations omitted); *Washington County Dep't of Soc. Servs. v. Clark*, 296 Md. 190, 198, 461 A.2d 1077 (1983) (citing *Shetler v. Fink*, 231 Md. 302, 306–07, 190 A.2d 76 (1963); *Winter v. Director*, 217 Md. 391, 395–96, 143 A.2d 81

(1958)). To determine what is in the child's best interest, the court must consider the factors enumerated in FL § 5–313(c). In addition, when the child has been adjudicated CINA, as Abiagail was, the court must consider the factors set forth in FL § 5–313(d). Because the trial court's decision may forever deprive the parent of his or her fundamental parental rights, *see Santosky v. Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the court must make express findings of fact respecting all of the applicable statutory factors. FL § 5–313(c) and (d).

 On review,

[o]ur function ... is not to determine whether, on the evidence, we might have reached a different conclusion. Rather, it is to decide only whether there was sufficient evidence—by a clear and convincing standard—to support the chancellor's determination that it would be in the best interest of [the child] to terminate the parental rights of the natural [parent]. In making this decision, we must assume the truth of all the evidence, and of all of the favorable inferences fairly deducible therefrom, tending to support the factual conclusion of the trial court.

*In re Adoption No. 09598*, 77 Md.App. 511, 518, 551 A.2d 143 (1989) (citing *Pahanish v. Western Trails, Inc.*, 69 Md.App. 342, 354, 517 A.2d 1122 (1986)). In reviewing the circuit court's decision, therefore, "we must ascertain whether the [court] considered the statutory criteria, whether its factual determinations were clearly erroneous, whether the court properly applied the law, and whether it abused its discretion in making its determination." *In re Adoption/Guardianship No. 94339058/CAD*, 120 Md.App. 88, 101, 706 A.2d 144 (1998) (citing *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 311, 701 A.2d 110 (1997)); *see also In re Adoption/Guardianship No. T98314013*, 133 Md.App. 401, 416, 758 A.2d 552 (2000).

The appellant acknowledges that the trial court considered all of the statutory factors applicable to this case. She does not point to any particular factual finding of the court that was

**588**

clearly erroneous and she does not argue that the court improperly applied the law. She argues, however, that given her young age at the time of Abiagail's birth and the history of sexual and physical abuse that led to her adjudication as a CINA, the court erred by failing to consider whether the reunification services offered by the Department were appropriate or adequate.

At the conclusion of the trial, the court reviewed all of the evidence from the bench and made its ruling. The trial court's recitation of facts makes plain that it took into consideration the abuse and trauma that the appellant sustained growing up and her young age at the time of Abiagail's birth. Indeed, the court made reference to these facts repeatedly, and did so in conjunction with its express consideration of the nature of the reunification services offered by the Department. The court made plain in its ruling that, to its mind, the appellant had been unwilling to comply with any of the terms of the many service agreements into which she entered, and had rebuffed most of the services that were offered to her. Indeed, the court also found that the appellant's level of non-cooperation was such that had any additional services been offered, in all likelihood she would have refused them as well.

The record supports the trial court's findings; moreover, there is nothing in the record to support the appellant's argument that the services that were offered to her were inadequate or inappropriate. To be sure, the circumstances of the appellant's childhood have been tragic. Nevertheless, there was sufficient evidence, under a clear and convincing evidence standard, to support the trial court's ultimate finding that the termination of the appellant's parental rights was in the best interest of Abiagail.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**