910 A.2d 452

**William R. WOODFIELD, Jr., et al.**

v.

**WEST RIVER IMPROVEMENT ASSOCIATION, INC., et al.**

**No. 3, Sept. Term, 2006.**

Court of Appeals of Maryland.

Nov. 6, 2006.

Eileen E. Powers (Charles F. Delavan of Blumenthal, Delavan & Williams, P.A., on brief), Annapolis, for petitioners.

William M. Ferris (Lynn T. Krause of Krause & Ferris, on brief), Annapolis, for respondents.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

The dispute here is over a Class H (Beer, Wine, Liquor) Music and Sunday license issued by the Board of License Commissioners for Anne Arundel County to William Woodfield, Jr., acting for Superior Woodfields, L.L.C. (Superior Woodfields).[1] Respondent, West River Improvement Association, along with many members of the Galesville community, protested the Superior Woodfields application, contending,

---

1.  Maryland Code, Art. 2B, § 9–101(a) provides that a license may not be issued to a corporation, partnership, or limited liability company, but only to an individual authorized to act for such an entity. Presumably, the actual licensee was therefore Woodfield, acting for Superior Woodfields. Because, for purposes of the issues actually before us, the interests of Woodfield and his company are the same, we shall, for convenience, refer mostly to the company, Superior Woodfields.

among other things, that one Charles Bassford, who already had an interest in two or more other liquor licenses in the county, would also have an interest in this one, and that the law prohibited a person from having an interest in more than one license.

In announcing the Board's decision to issue the license, the chairman, at least inferentially, opined that sufficient evidence had not been produced to establish that Bassford would have any pecuniary interest in the license. Upon respondent's petition for judicial review, however, the Circuit Court for Anne Arundel County concluded that "by any reasonable interpretation of the evidence presented, a trier of fact would conclude that Mr. Bassford has a direct or indirect interest in this applicant [Superior Woodfields] as well as two other liquor license holders in Anne Arundel County," and, on that ground, reversed the Board's decision. A divided Court of Special Appeals affirmed the Circuit Court judgment. It agreed that the Board "erroneously ignored mounting and uncontroverted testimony that Bassford had an interest in the license at issue and two other liquor licenses" in the county. *See Woodfield v. West River*, 165 Md.App. 700, 709, 886 A.2d 944, 950 (2005).

We granted *certiorari* to determine (1) whether the circuit and intermediate appellate courts improperly substituted their judgment for that of the Board on the issue of Bassford's status, and (2) whether the Circuit Court lost its authority to make any decision in the matter once 90 days elapsed from the filing of the administrative record with the court. We shall hold that, on the record before us, the Circuit Court did not lose its authority to make a decision but that it failed to give proper deference to the administrative determination regarding Bassford, and, on that basis, we shall reverse the judgment of the appellate court and remand with instructions to direct that the decision of the Board be affirmed.

## BACKGROUND

On January 23, 2003, William Woodfield, Jr., on behalf of Superior Woodfields, a limited liability company of which he

was the only member, applied for a Class B (Beer, Wine, Liquor) Music and Sunday license. In the application, which was under oath, Woodfield asserted, among other things, that:

(1) the location of the desired license would be 4701 Woodfield Road in Galesville;

(2) the owner of that premises was 3809 Crain Limited Partnership;

(3) the applicant had a pecuniary interest in the business to be conducted under the license;

(4) the applicant was not pecuniarily interested in any other place of business in any county or Baltimore City where a license under Art. 2B of the Maryland Code had been applied for or issued; and

(5) "[n]o person except the applicant(s) is in any way pecuniarily interested in the license applied for *or in the business to be conducted thereunder* during the continuance of the license, if issued." (Emphasis added).

Mr. Bassford also signed the application and attested, as president of 3809 Crain, Inc., that 3809 Crain, Inc. was the general partner in 3809 Crain Limited Partnership (Crain LP) and that Crain LP was the owner of the property named in the application.

The Board conducted an evidentiary hearing on the application on April 8, 2003. Section 10–202(a)(2)(ii) of Art. 2B requires a county licensing board, before issuing a license, to consider, among other things, the public need and desire for the license, the number and location of existing licenses, and the impact that the license would have on the general health, safety, and welfare of the community, including issues relating to crime, traffic conditions, parking, or convenience. Section 10–202(a)(2)(iii) requires that an application be disapproved and that the license be "refused" if the granting of the license is not necessary for the accommodation of the public, "the applicant has made a material false statement in [the] application," or the operation of the business, if the license is granted, will unduly disturb the peace of the residents in the neighborhood.

Most of the evidence presented concerned whether the granting of a Class B license was in the public interest or would be detrimental to public safety. The greatest part of the considerable opposition to the application, from residents in the Galesville area and from the respondent improvement association, dealt with the asserted lack of public need for the license and concerns about traffic congestion and safety. Those issues are not before us. At least two opponents raised the question of whether Mr. Bassford, who allegedly had an interest in two other restaurants in the county with liquor licenses, also would have an interest in the license at issue. Counsel for Superior Woodfields, in an opening statement to the Board, advised that a crab and seafood restaurant would be operated at the site by Annapolis Produce, Inc., a tenant of Crain LP, that Woodfield and Superior Woodfields would be the license holder and would "hold and manage the alcoholic beverage operation at the facility" pursuant to a management agreement between Superior Woodfields and Annapolis Produce. That agreement was not placed into evidence, nor were its terms described in any detail. Woodfield, he said, had run an ice and seafood business at the location for many years, and those operations would continue. No evidence was offered of whether, or to what extent, Bassford or any company with which he was or would be associated would receive any of the revenue or profits from the sale of alcoholic beverages.

The issue of Bassford's status was not formally raised until near the end of the proceeding, when a representative of the improvement association noted that the Board of Directors of the association had voted to oppose the application for several reasons, one being that Mr. Bassford, "while not the applicant owns Woodfields and also owns two (2) of the other liquor license restaurants." Another resident also noted in his testimony that Bassford "already bought" those two restaurants. A third resident, Mr. Rogers, who had attempted to raise the issue earlier, repeated the assertion that Bassford owned the two other restaurants and contended that Bassford was also "the real applicant here" and that there was "a silent partner, a silent owner in this establishment." When asked by the

Board what evidence he had to support that assertion, Rogers admitted that he had none, other than that, when Bassford and Woodfield appeared at a meeting with the improvement association, Bassford did all of the talking. Rogers claimed, however, that, if he were allowed to conduct discovery, he could probably decipher the relationship between Mr. Bassford and Mr. Woodfield.

At that point, the Board chairman questioned Woodfield directly on that issue, reminding him that he was under oath. Woodfield responded that Bassford owned the property, that Annapolis Produce owned the business, and that he would work for Annapolis Produce and would be one of the managers of the restaurant. In response to the question, "Okay, so what's Mr. Bassford's financial interest in this license," Woodfield said, "None." He added that the reason he did not speak at the neighborhood meeting is that no one asked him any questions.

Rogers then retorted that he believed that Bassford owned Annapolis Produce.[2] When asked about that, counsel for Woodfields said that, although he believed that Bassford was "a principal" in Annapolis Produce, he did not know who actually owned the company or what Bassford's share of the business was. Counsel added later that Bassford was not a member and held no ownership interest in Superior Woodfields, which was the applicant for the license. In response to an objection lodged to testimony from another, unidentified protestant that Bassford owned two other restaurants and a liquor store, the chairman stated that "the Board will place whatever weight we think is appropriate in the issue of whether or not Mr. Bassford is a silent owner or not." He added that "I haven't been presented any evidence indicating that he is a silent owner" and that "[t]he mere fact that he owns the land and acts as the landlord under our rules does

---

2. Rogers proffered that he had a Dun & Bradstreet report showing Bassford to be the president of that company. An objection on the ground of relevance was sustained by the Board. The correctness of that ruling has not been raised as an issue by respondents in their brief, and we therefore do not address it.

not give him a financial interest as being a owner of this liquor license."

In its written decision, the Board did not address directly the issue of Bassford's status. In announcing the decision, however, the chairman noted that one of the issues it needed to address was whether there were any false representations in the application, and, in that regard, he declared that "notwithstanding the allegation of a silent partner [ ] there hasn't been any credible evidence that has been produce[d] in rising to the level that this applicant has made any false ... material statements or committed fraud in the application." Given Woodfield's assertion in the application that no other person had any pecuniary interest in the license or in the business to be conducted thereunder and his live testimony that Bassford had no interest in the license, coupled with the chairman's immediately previous statement that he had seen no evidence indicating that Bassford was a "silent owner," we take the chairman's final statement as a finding that Bassford had no such interest.[3]

Respondents filed a petition for judicial review on May 6, 2003. Two months later, on July 3, they filed a petition for a temporary restraining order and other injunctive relief, to preclude Superior Woodfields from using the license. In support of the petition for injunctive relief, they attached various documents purporting to establish, among other things, that Bassford had a direct or indirect interest in at least three other liquor licenses, that he was president of Annapolis Produce, which would operate the restaurant under the challenged license to Superior Woodfields, and that his

---

3. As noted, Superior Woodfields had applied for a Class B (Beer, Wine, Liquor) Music and Sunday license. The Board denied that request and instead issued a Class H license. A Class B license authorizes the holder to sell beer, wine, and liquor for consumption "on the premises or elsewhere." *See* Art. 2B, § 6–201(a). A Class H license, in Anne Arundel County, restricts the sale of such beverages to consumption on the premises. *See* § 6–201(c)(3)(i). Several witnesses testifying in opposition to the application expressed special concern about sales for off-site consumption. Neither Woodfield nor Superior Woodfields has complained about this, or any other, aspect of the Board's decision.

lawyer incorporated Superior Woodfields. The petition for temporary restraining order was denied upon a finding of insufficient evidence of immediate and irreparable harm.

On July 25, 2003, the Board filed the record of its proceedings with the court. That triggered the running of Art. 2B, § 16–101(e)(3). Section 16–101(e) deals generally with the procedures governing an action for judicial review of a liquor board's decision. Subsection (e)(3) provides that, "[u]nless extended by the court for good cause, the local licensing board's decision made under subsection (a) of this section shall be affirmed, modified, or reversed by the court within 90 days after the record has been filed in the court by the local licensing board." The 90 day period expired October 23, 2003.

On August 4, 2003, the court's assignment office scheduled a hearing in the matter for October 27—four days beyond the 90–day period provided for in § 16–101(e)(3). Counsel for Superior Woodfields promptly wrote to the assignment clerk, pointed out the problem, and suggested an earlier hearing. Counsel for the protestants, equally concerned, filed a motion on September 5, attached to which were two alternative proposed orders. One proposed order kept the hearing date at October 27 but declared that, because scheduling conflicts on the part of the court precluded an earlier date, there was good cause to extend the hearing and any decision in the appeal beyond the 90–day period. The alternative proposed order would have rescheduled the hearing for an earlier date. Superior Woodfields opposed the request to find good cause for delay and requested again that the hearing be scheduled prior to October 23.

On October 20, the judge assigned to hear the case signed the proposed order maintaining the October 27 hearing date and finding that scheduling conflicts constituted "good cause to extend this hearing and any decision on this appeal beyond the 90 day period detailed in Art. 2B, § 16–101(e)(3)." The court, through handwritten interlineation, found as additional good cause for the extension that the motion for extension and the opposition to that motion "were not brought to a Judge in

time for consideration, due to clerical error." For whatever reason, the order, though showing on its face that it was dated and signed by the judge on October 20, was not docketed by the clerk until November 14, 2003. Also on October 20, the court denied a motion by the protestants to admit into evidence the documents attached to their petition for injunctive relief, including the Dun & Bradstreet report referred to by Mr. Rogers at the Board hearing.

At the commencement of the October 27 hearing, counsel represented to the court that the extension order it had signed extended only the time for the hearing but not the time for making a decision in the case and suggested that the order be amended to extend further the time for a decision. Counsel for Superior Woodfields—the respondent/defendant in the case—made clear that he did not believe that the court had lost jurisdiction because of the delay at the Circuit Court level and pointed out, in that regard, that he had not filed a motion to dismiss the petition for judicial review. In an exercise of caution, however, the court announced that it would amend the order "and indicate that having found that there was cause to extend beyond the 90 days in order to have the hearing and having found that—or recognizing that there needs to be some sort of a written decision that the Court will extend the order, 30 days should be adequate from today so that the 27th of November, in order to have the hearing and issue a written decision." [4] No amendatory order was ever filed.

On November 14, 2003, the court filed a memorandum opinion and order reversing the Board's decision, solely on the ground that its conclusion that Bassford had no pecuniary interest in the license was clearly erroneous. The court

---

4. As we shall discuss later, it would appear that both counsel and the court gave too narrow a reading to the October 10 order. Although the first part of it spoke about the impracticability of setting a hearing before October 23, the operative part made clear that scheduling conflicts and the delay in presenting the motion for extension constituted good cause "to extend this hearing *and any decision on this appeal*" beyond the 90-day period provided for in § 16–101(e)(3). (Emphasis added).

recounted evidence before the Board showing that Bassford was the owner of the property on which the proposed restaurant would be located, that he also was a principal and shareholder in Annapolis Produce—the tenant that would operate the restaurant—and that he owned at least two other restaurants in the Galesville area that held liquor licenses.

The court quoted the two relevant provisions of Art. 2B, § 9–301. The first states that, in Anne Arundel and certain other counties:

"[A] person, partnership, firm, or corporation, except by way of renewal, may not have an interest in more than one license, whether held or controlled by direct or indirect ownership, by stock ownership, interlocking directors or interlocking stock ownership, or in any other manner, directly or indirectly. It is the intention of this section to prohibit any person, firm, partnership or corporation from having any interest, directly or indirectly, in more than one license."

The second provision, contained in § 9–301(3)(i), provides, with respect to Anne Arundel County in particular and subject to certain exceptions which no one suggests are applicable:

"In Anne Arundel County, a person, franchisor, franchisee, chain store operation, partnership, firm or corporation, except by way of renewal, may not have any interest in more than one license, whether held or controlled by direct or indirect ownership, by franchise operation, by chain store operation, by stock ownership, interlocking directors or interlocking stock ownership, or in any other manner directly or indirectly. It is the intention of this subsection to prohibit any such persons, franchisor, franchisee, chain store operation, firm, partnership, or corporation from having any interest, directly or indirectly, in more than one license."

After quoting those provisions, the court concluded:

"The Court finds that by any reasonable interpretation of the evidence presented, a trier of fact would conclude that Mr. Bassford has a direct or indirect interest in this appli-

cant as well as two other liquor license holders in Anne Arundel County, which would violate § 9–301. Mr. Bassford has an ownership interest in both the landlord and the tenant entities. The tenant (Annapolis Produce) will own and operate the restaurant. There was no evidence that there is a separation between the sale of food and liquor at the restaurant, or that Bassford would somehow only have an interest in the food sales but not the liquor sales. Similarly, there is no evidence that all the proceeds from the liquor sales would go only to Mr. Woodfield and/or Superior Woodfields. Without such evidence, logic dictates that the owner of a restaurant that sells liquor has a direct or indirect interest in the liquor sales.... There is no way a reasonable fact finder could have come to any conclusion other than that Mr. Bassford has an interest in the sale of liquor, regardless of how the application to the liquor license was crafted."

Because, the court declared, the granting of the license violated § 9–301, the Board's decision must be deemed against the public interest and, for that reason, illegal.

Woodfield and Superior Woodfields appealed, complaining that the Circuit Court erred (1) by substituting its judgment for that of the Board with respect to Bassford's status, and (2) by failing to rule on the agency decision within the 90–day period allowed by § 16–101(e)(3). The appellate court found no merit in either complaint. With respect to the second argument, the court held, first, that both scheduling conflicts and clerical error justified the extension granted by the court, and that, in any event, the 90–day period was "directory" rather than "mandatory."

On the issue of Bassford's status, the Court of Special Appeals not only concurred in the Circuit Court's analysis but extended somewhat the trial court's findings. Relying on the Dun & Bradstreet report referenced by Mr. Rogers, which was not admitted into evidence either by the Board or by the Circuit Court, the appellate court found, first, that Bassford was president of Annapolis Produce and later that he was the

"owner" of that entity. *See Woodfield v. West River, supra,* 165 Md.App. at 709 and 712, 886 A.2d at 949 and 951. The court concluded that "Bassford, as owner of Annapolis Produce, was the employer of Woodfield, the licensee, and ran the restaurant," that "[i]n his capacity as president of Annapolis Produce, he had, *we assume,* the power to determine the amount of alcohol the restaurant purchased, the type of alcohol it purchased, and the sale price of that alcohol," and that "Woodfield, as his employee, had little room to complain." *Id.* at 712, 886 A.2d at 951. (Emphasis added).

## DISCUSSION

### *Effect of § 16–101(e)(3)*

■ We shall consider first the issue of whether the Circuit Court lost jurisdiction or authority to render a decision once the 90–day period specified in § 16–101(e)(3) of Art. 2B expired. As an alternative ground for holding that authority was not lost, a majority of the Court of Special Appeals concluded that the statute was "directory" rather than "mandatory." We shall not decide the issue precisely on that basis, because, though certainly traditional, the mandatory/directory approach to determining the consequences of a failure to comply with a statutory command is an artificial one that addresses the appropriate question in a circular fashion. In *Tucker v. State,* 89 Md.App. 295, 297–98, 598 A.2d 479, 481 (1991), which dealt with a somewhat similar matter—the failure of a judicial panel to render a decision within the time set in a statute—the Court of Special Appeals observed:

"In dealing with statutory commands, including time provisions such as these, courts often speak in terms of whether they are 'mandatory' or merely 'directory'.... The suggestion implicit from such an analysis is that, if the command is 'mandatory,' some fairly drastic sanction must be imposed upon a finding of noncompliance, whereas if the command is 'directory,' noncompliance will result in some lesser penalty, or perhaps no penalty at all. That, indeed, is really the issue. When a legislative body commands that something

be done, using words such as 'shall' or 'must,' rather than 'may' or 'should,' we must assume, absent some evidence to the contrary, that it was serious and that it meant for the thing to be done in the manner it directed. In that sense, the obligation to comply with the statute (or rule) is both mandatory and directory. The relevant question in such a case is whether the sanction sought for noncompliance is an appropriate one."

*See also Thanos v. State,* 332 Md. 511, 522, 632 A.2d 768, 773 (1993); *State v. Green,* 367 Md. 61, 82, 785 A.2d 1275, 1287 (2001); *Gorge v. State,* 386 Md. 600, 613, 873 A.2d 1171, 1179 (2005), quoting with approval from *Tucker.*

The *Tucker* court noted that this Court had essentially adopted that view, with respect to commands found in the Maryland Rules, in its promulgation of Maryland Rule 1–201.[5] The court observed that, although Rule 1–201(a) applies only to the construction of the Maryland Rules, the standards espoused in it are equally applicable to statutory commands, and that "[e]ven when applying a 'mandatory/directory' standard, the courts have essentially looked to the context of the enactment and ultimately to the legislative intent in determining what, if any, sanction to impose for noncompliance." *Tucker v. State, supra,* 89 Md.App. at 298, 598 A.2d at 481. Thus, "[i]f the legislative body has provided a sanction for noncompliance, its intent is clear, and that sanction, if lawful, *i.e.,* Constitutional, has ordinarily been applied[,]" but "[i]f no clear sanction has been provided, the court has attempted to discern the overall purpose of the statute and then determine which, if any, sanction will best further that purpose."

Although, because of the way in which the Court has gone about pigeon-holing such statutory commands, the same result

---

**5.** Rule 1–201(a) provides, in relevant part:

"When a rule, by the word "shall" or otherwise, mandates or prohibits conduct, the consequences of noncompliance are those prescribed by these rules or by statute. If no consequences are prescribed, the court may compel compliance with the rule or may determine the consequences of the noncompliance in light of the totality of the circumstances and the purpose of the rule."

is likely to be achieved by using a mandatory/directory approach—categorizing such commands as either mandatory or directory—we believe that the *Tucker* analysis is the better analytical framework for determining the consequence of noncompliance with a statutory mandate.[6]   The analysis undertaken by the Court of Appeals majority fits well within that framework.   As the majority observed, the predecessor statute to § 16–101(e)(3), enacted in 1943, provided that "[t]he failure of the court to determine an appeal within a period of 30 days after the record has been filed in court by the local board as above provided, *shall constitute an automatic affirmance* of the local board's decision, unless the time has been extended by the court for good cause shown," quoting from *Scherr v. Braun, supra,* 211 Md. at 557, 128 A.2d at 389. (Emphasis in original).   In *Scherr,* this Court construed that statute as "so interwoven with the special authority granted the court as to be part of it, a limitation on its powers" and thus held that, if the decision was not rendered within the allowable period and the time for making the decision had not been extended in accordance with the statute, "the authority given in the first instance to decide or act in the case is automatically withdrawn...." *Id.* at 566, 128 A.2d at 394.

In 1991, the Legislature amended the statute to delete the default provision that failure to determine the appeal within

---

**6.** That the two approaches tend to end up at the same place is well illustrated by *Scherr v. Braun,* 211 Md. 553, 128 A.2d 388 (1957), where this Court observed:

"Where the directions of a statute look to the orderly and prompt conduct of business, including the business of a court, it is generally regarded as directory unless consequences for failure to act in accordance with the statute are set out.   Statutory provisions fixing the time for performance of acts are held to be directory where there are no negative words restraining the doing of the act after the time specified and no penalty is imposed for delay."

*Id.* at 561, 128 A.2d at 392.   Striking a bit closer to home, the Court, in *McCall's Ferry Co. v. Price,* 108 Md. 96, 112–14, 69 A. 832, 838–39 (1908), concluded that the *Constitutional* mandate (Art. IV, § 15 of the Maryland Constitution) that this Court file a written opinion in every case within three months after argument or submission of the case was directory and did not preclude the Court from deciding an appeal and filing an opinion after the three month period ended.

the allowed period would constitute an automatic affirmance and thereby rendered inapposite the result reached in *Scherr.* *See* 1991 Md. Laws, Ch. 560. That, coupled with the fact that no other default or sanction was incorporated, is the most powerful evidence that the Legislature did not intend for noncompliance with the now–90–day period to produce any automatic result. *Compare Brewer v. Brewer,* 386 Md. 183, 872 A.2d 48 (2005).

Even if that were not the case, it is clear that the Circuit Court did timely and validly extend the time for decision in its order of October 20. The court was aware, from both sides, that it needed either to decide the case by October 23 or extend the time for making its decision, and it entered the order that extended the time for both the hearing, then scheduled for October 27, *and for determining the appeal.* No one has even suggested—nor is there any basis in this record for a suggestion—that the order was not signed, as it purports to have been, on October 20.

That the order was not docketed until November 14 is irrelevant. Although, by virtue of Maryland Rule 2–601, a *judgment* is not effective until docketed by the clerk, no such requirement exists with respect to routine procedural orders extending the time for an event to occur. Those kinds of orders must, of course, be docketed in due course and as promptly as possible, but so long as the parties are aware of the order, it is not a nullity and does not ordinarily lose its efficacy prior to its being docketed. If the law were otherwise, any mishap or delay by the clerk could frustrate the court's decision and significantly prejudice a party. The parties here were clearly aware when they gathered for the hearing on October 27 that the order had been signed, and no one suggested that the order was not valid and effective, at least for the purpose of extending the hearing. The only concern expressed was that it did not suffice to extend the time for making a decision in the case, which, on its face, it clearly did.

### *Mr. Bassford's Status*

■ There was unquestionably injected into this case, at the Board level, a suspicion that Mr. Bassford had a financial interest in at least two existing restaurants in the county that sold alcoholic beverages in connection with their operation and that he had some sort of interest in Annapolis Produce—the company that would own and operate the restaurant at issue here—as well. Notwithstanding that suspicion and the assertions that generated it, the Board, at least implicitly, found as a fact that Bassford would have no financial interest in the license applied for by Woodfield. The two lower courts disagreed with that finding and held, essentially, that there was no substantial evidence to support it.

The actual evidence before the Board in support of the protestants' assertions is very, very thin. Additional documentary evidence, casting further suspicion that Bassford was involved in the formation of companies that operated both existing restaurants operating with a liquor license and in Annapolis Produce, was offered in the Circuit Court but rejected. Those documents could have been offered to the Board but were not. They are not, therefore, in evidence and may not be relied upon in determining the validity of the Board's decision. The Court must deal with the record as it is, not as it could have been, and on the record we have, we cannot conclude that the Board was clearly erroneous in its finding regarding Bassford. Art. 2B, § 16–101(e)(1) sets forth the standard to be applied in judicial review actions from liquor board decisions. Though articulated differently, the statutory standard is consistent with the more general law regarding the review of administrative agency decisions:

> "[T]he action of the local licensing board shall be presumed by the court to be proper and to best serve the public interest. The burden of proof shall be upon the petitioner to show that the decision complained of was against the public interest and that the local licensing board's discretion in rendering its decision was not honestly and fairly exercised, or that such decision was arbitrary, or procured by fraud, or unsupported by any substantial evidence, or was

unreasonable, or that such decision was beyond the powers of the local licensing board, and was illegal."

*Compare* Maryland Code, § 10–222(h) of the State Government Article, setting forth the standard for judicial review under the State Administrative Procedures Act, and *see United Parcel v. People's Counsel,* 336 Md. 569, 577, 650 A.2d 226, 230 (1994) (court's role in judicial review of administrative agency decision "limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.").

The Board had before it Woodfield's application, in which, under oath, he averred that no one, other than he, was "in any way pecuniarily interest[ed] in the license applied for or in the business to be conducted thereunder during the continuance of the license, if issued." Woodfield confirmed that statement, under oath, at the hearing when, in direct response to the Board chairman's question, he stated that Bassford had no interest in the applied-for license. That constituted evidence—substantial evidence, as it came under oath from the applicant—that Bassford would have no interest in the license. The Board was entitled to credit that evidence. Aside from unsupported statements by protestants that Bassford had an interest in two other restaurants, all that stood in opposition to Woodfield's assertion regarding the license at issue were (1) Rogers's unsuccessful attempt to show that a Dun & Bradstreet report indicated that Bassford was president of Annapolis Produce, and (2) the statement by Woodfield's counsel that, while he believed that Bassford was a principal of some kind in Annapolis Produce, he did not know what interest Bassford actually had in the company.

It may well be that Bassford does, indeed, have a direct or indirect financial interest in one or more other licenses and in the license applied for by Woodfield. The problem is that clear and persuasive evidence to that effect was not presented to the Board, which acted, as it had a right to act, upon what

was before it. The courts erred in reversing the Board's decision to issue the license.

**JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AND REMAND CASE TO THAT COURT WITH INSTRUCTIONS TO AFFIRM DECISION OF BOARD OF LICENSE COMMISSIONERS OF ANNE ARUNDEL COUNTY; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENTS.**

Judge CATHELL joins in the judgment only.