957 A.2d 191

### Sonda OWENS

v.

### PRINCE GEORGE'S COUNTY DEPARTMENT OF SOCIAL SERVICES.

### No. 1565, Sept. Term, 2007.

Court of Special Appeals of Maryland.

Sept. 16, 2008.

Joseph C. Ruddy, Jr., Hyattsville, for appellant.

Sandra Barnes (Douglas F. Gansler, Atty. Gen., on brief), for appellee.

Panel: HOLLANDER, SALMON, DEBELIUS, JOHN W., III, (Specially Assigned), JJ.

SALMON, J.

On January 25, 2002, the Prince George's County Department of Social Services (the "Department") released a written finding that Sonda Owens (hereinafter "Mrs. Owens") was responsible for "indicated" child neglect with regard to her 15 year old niece, Sandy. On December 4, 2004, an administrative law judge ("ALJ") upheld the finding of the Department and signed an order allowing the Department to "identify ... [Mrs. Owens] as an individual responsible for indicated child neglect in a central registry and in other files."

In response to the ALJ's findings, Mrs. Owens filed a petition for judicial review in the Circuit Court for Prince George's County, but that court, for reasons not here material, dismissed her petition. This Court, in an unreported decision filed November 29, 2006, reversed the dismissal and remanded the case to the circuit court. On remand, the circuit court affirmed the decision of the ALJ.

Mrs. Owens filed a second appeal, in which she advances three arguments, viz: (1) the ALJ erred when he denied her motion to dismiss the Department's finding of neglect because the Department failed to complete its investigation within 60 days as required by a Maryland statute; (2) the ALJ erred when he found that Mrs. Owens had accepted responsibility for the care, custody, and supervision of Sandy; and (3) there was a lack of substantial evidence in the record to support the ALJ's finding that Mrs. Owens ordered Sandy to leave her home in September 2001 and, therefore, there was no evidentiary basis for the ALJ's finding of indicated child neglect.

# I

An ALJ conducted a hearing on October 28, 2004, concerning Mrs. Owens' alleged neglect of Sandy. At the hearing three witnesses testified: (1) Patrick Emecheta, an employee of the Department; (2) Mrs. Owens; and (3) Derrick A. Owens, Mrs. Owens' husband. In addition, the Department introduced into evidence thirty-three pages from its file con-

cerning the investigation into the allegation that Sandy had been neglected.

Sandy was born in March, 1986 and is now twenty-two years old. She was abandoned by her mother, Tiffany, when she was an infant. Sandy's father has been in prison for most of Sandy's life.

From the time Sandy was three months old until she was twelve, she lived with her paternal grandmother and step-grandfather in North Carolina. Sandy's paternal grandmother died when she was twelve. Thereafter, she continued to live with her step-grandfather for about two years. Sandy was never adopted.

In 1999, when Sandy was thirteen years old, she gave birth, in North Carolina, to a daughter. To further complicate matters, at about the same time, Sandy's step-grandfather became ill with prostate cancer and could no longer look after Sandy.

In December 1999, Mrs. Owens' sister, Dinicia McNeal, received a call from an elderly aunt who lived in North Carolina. The caller told Ms. McNeil that someone had to come to North Carolina immediately or else Sandy and her infant daughter would be turned over to the North Carolina's Department of Social Services and would be put in foster care. Ms. McNeil called Mrs. Owens and told her of Sandy's plight. The next morning, Mrs. Owens, her husband, and Ms. McNeil left for North Carolina. In Mrs. Owens' words, she and her sister made the trip because "we were the only family [Sandy] had." After the threesome arrived in North Carolina, they picked up Sandy at her step-grandfather's house and then picked up Sandy's baby at a "care-giver's house." Next, without contacting North Carolina authorities, Mrs. Owens, her husband, and Ms. McNeil took Sandy and her baby to Prince George's County, Maryland. When they arrived in Maryland, Mrs. Owens and Ms. McNeil "jointly" decided that Ms. McNeil would take care of the infant and Mrs. Owens

would take care of Sandy.[1]

Thereafter, Sandy moved into the home of Mrs. Owens and her husband in Upper Marlboro, Maryland. Also living in the house were the Owens' two pre-teen daughters.[2] Mrs. Owens thereafter obtained a letter from Sandy's incarcerated father (Mrs. Owens' brother) that authorized Mrs. Owens to enroll Sandy in the Prince George's County school system.

For the next two years (approximately), Mrs. Owens and her husband provided Sandy with a good home. In return, Mrs. Owens received $300.00 per month from the Department-starting in January, 2000. Nevertheless, Mrs. Owens did not profit from caring for Sandy because she voluntarily paid the $300.00 to Ms. McNeil in order to help the latter pay for daycare expenses for Sandy's daughter.

In late August or early September, 2001, when Sandy was fifteen and one-half years old, Sandy left Mrs. Owens' house and went to live with a neighbor named Tina Latamore. The reason Sandy left was a matter of dispute at the hearing before the ALJ.

Mr. Emecheta testified that the Department received a report that Mrs. Owens had put Sandy out of the house because she had broken into the Owens' home five times. Mr. Emecheta was assigned to investigate the report of neglect.

On September 11, 2001, Mr. Emecheta went to the home of Ms. Latamore, the person with whom Sandy had been staying for about a week. Ms. Latamore advised that she had temporarily taken Sandy in because Mr. and Mrs. Owens had kicked

---

1. At the hearing before the ALJ, Mrs. Owens and the attorney representing the Department had the following exchange:

 [Department's Attorney] Q. You, by going down to North Carolina and picking her up, had made the decision that you were going to provide care and custody for Sandy?
 [Mrs. Owens] A. I made the decision to take care of her.
 Q. And you did so for two years. Correct?
 A. Yes.

2. Mrs. Owens' daughters were ages nine and eleven at the time of the hearing conducted by the ALJ.

Sandy out of the house. Ms. Latamore advised that although she had provided Sandy with a temporary place to stay and with food, she was no longer willing to care for her. The next day, September 12, 2001, Mr. Emecheta interviewed Sandy, who told him that she had been living with Mrs. Owens and her husband but that they would not let her back into their home. According to Mr. Emecheta, on the same day, September 12, 2001, he spoke with Mrs. Owens and her husband. Mrs. Owens advised that she had taken Sandy in at the request of a North Carolina Social Service Agency because Sandy's grandparents had died. At the time Mrs. Owens had taken Sandy into her care, the whereabouts of Sandy's mother were unknown and Sandy's father was incarcerated. Both Mr. and Mrs. Owens said that Sandy was out of control and had broken into their house four or five times. Mrs. Owens also told Mr. Emecheta in his September 12th interview that although she had taken care of Sandy for the past two years, she would not take her back.

Mr. Emecheta also interviewed Sandy's mother, Tiffany, who said that she thought that Sandy's grandparents had adopted Sandy. Mr. Emecheta researched that point and found that there was no record of an adoption in North Carolina. Tiffany further advised Mr. Emecheta that even though she was Sandy's biological mother, she did not know her daughter and did not want to take her in because to do so would disturb the peace of her new family. The "new" family included a husband and five children.

According to Mr. Emecheta's testimony, he had four sources upon which he based his conclusion that Mrs. Owens had "kicked out" Sandy from her home about a week before his interview with appellant on September 12, 2001. Those sources were: Ms. Latamore, Sandy, Mrs. Owens, and Mr. Owens.[3]

---

**3.** When Mr. Emecheta was cross-examined by Mrs. Owens' attorney, the following exchange occurred:

Q. Okay. But isn't it true that there was also evidence that she [Sandy] wasn't kicked out, that she left on her own?

Mr. Emecheta further testified that he met with Mrs. Owens and her husband for a second time on October 4, 2001, at a CINA (Child in Need of Assistance) hearing held at the courthouse in Prince George's County. During that conversation he told Mrs. Owens that he would not charge her with neglect if she would agree to take Sandy back into her care. Mrs. Owens refused.

Mrs. Owens and her husband testified that they did not kick Sandy out of their home. Instead, Sandy, on her own volition, started to spend more and more time at Ms. Latamore's home. According to the Owens' account, Sandy would stay at the neighbor's house in the company of her boyfriend, William, age seventeen. Sandy sometimes stayed with Ms. Latamore for several nights in a row. Mrs. Owens further testified that she and her brother had contacted the Department earlier in September 2001 and asked what options were available in order to give Sandy "some help." The Department advised that there was an independent living program that might be available but they needed to bring Sandy to the Department so that it could be determined whether she was eligible for that program. Mrs. Owens attempted to take Sandy into the Department but Sandy refused to cooperate.

Mrs. Owens also testified that on September 5, 2001 she, her husband, and her brother (Michael Adams) went across

---

A. It was untrue that the child wasn't kicked out. The child was kicked out, completely and 100 percent.

Q. How do you know that?

A. Because the child told me.

Q. Oh, and that's your only source of information, is that a 15–year–old, who you've already declared as in need of assistance, is the source of your conclusion.

MR. WHITACRE: [Counsel for the Department] Objection to the argumentative nature of the question.

JUDGE: Objection sustained.

By MR. RUDDY: [Counsel for Mrs. Owens]:

Q. All right. So the only source you have is this 15–year–old, Sandy?

A. Not my only source. Ms. Latamore also confirmed that the child was kicked out. Mrs. Owens also confirmed that the child was kicked out.

Q. Okay.

A. Mrs. Owens' husband also confirmed that the child was kicked out.

the street to Ms. Latamore's house. They paid this visit because Sandy had failed to come home the previous evening. Ms. Latamore was at work. Their knock on the door was answered by Sandy's boyfriend. The boyfriend advised that Sandy "wasn't coming out and wasn't going anywhere." Mrs. Owens then summoned the police. The police arrived at Ms. Latamore's house but the officers were unsuccessful in getting Sandy to come out.

Both Mrs. Owens and her husband contradicted Mr. Emecheta's testimony that he had talked to them on September 12, 2001. According to the Owens' testimony, they only talked to Mr. Emecheta once and that was at the October 4, 2001, CINA hearing.

## II.

### The Sixty Day Requirement

The Department received its first report of suspected neglect concerning Sandy on September 5, 2001. The Department's investigation was not completed until January 25, 2002, which was 142 days after receipt of the first report of neglect.

Maryland Code (2004), Family Law Article ("FL"), section 5–706 reads, in material part, as follows:

§ 5–706. Investigation.

(a) *In general.*—Promptly after receiving a report of suspected abuse or neglect of a child who lives in this State that is alleged to have occurred in this State:

(1) the local department or the appropriate law enforcement agency, or both, if jointly agreed on, shall make a thorough investigation of a report of suspected abuse to protect the health, safety, and welfare of the child or children; or

(2) the local department shall make a thorough investigation of a report of suspected neglect to protect the health, safety, and welfare of the child or children.

(b) *Time for initiation; actions to be taken.*—Within 24 hours after receiving a report of suspected physical or

sexual abuse of a child who lives in this State that is alleged to have occurred in this State, and within 5 days after receiving a report of suspected neglect or suspected mental injury of a child who lives in this State that is alleged to have occurred in this State, the local department or the appropriate law enforcement agency shall:

(1) see the child;

(2) attempt to have an on-site interview with the child's caretaker;

(3) decide on the safety of the child, wherever the child is, and of other children in the household; and

(4) decide on the safety of other children in the care or custody of the alleged abuser.

(c) *Scope.*—The investigation under subsection (b) of this section shall include:

(1) a determination of the nature, extent, and cause of the abuse or neglect, if any;

(2) if mental injury is suspected, an assessment by two of the following;

(i) a licensed physician, as defined in § 14–101 of the Health Occupations Article;

(ii) a licensed psychologist, as defined in § 18–101 of the Health Occupations Article; or

(iii) a licensed social worker, as defined in § 19–101 of the Health Occupations Article; and

(3) if the suspected abuse or neglect is verified:

(i) a determination of the identity of the person or persons responsible for the abuse or neglect;

(ii) a determination of the name, age, and condition of any other child in the household;

(iii) an evaluation of the parents and the home environment;

(iv) a determination of any other pertinent facts or matters; and

(v) a determination of any needed services.

\* \* \*

(g) *Time for completion.*—(1) To the extent possible, an investigation under subsections (b) and (c) of this section shall be completed within 10 days after receipt of the first notice of the suspected abuse or neglect by the local department or law enforcement agencies.

(2) *An investigation under subsections (b) and (c) of this section which is not completed within 30 days shall be completed within 60 days of receipt of the first notice of the suspected abuse or neglect.*

(Emphasis added.)

Mrs. Owens stresses that section 5–706(g)(2) uses the word "shall." She asserts that by the use of this term the General Assembly intended that the time limit be mandatory. According to appellant, because of the mandatory nature of the requirement, dismissal of the neglect charge "was the appropriate sanction."

The ALJ rejected Mrs. Owens' request to dismiss for the following reasons: (1) no penalty is attached for the Department's failure to abide by the 60–day time limit to conduct the investigation pursuant to COMAR 07.02.07.09; [4] (2) appellant

---

4. Section 07.02.07.09 of COMAR provides in relevant part:

 A. *All Investigations.*

 (1) Within 10 days of receiving a report, the local department or, where applicable, law enforcement shall report preliminary findings to the local State's Attorney's office.

 (2) The local department shall complete its investigation using assessment tools and forms required by the Administration.

 (3) The local department or, by joint agreement, law enforcement shall:

 (a) To the extent possible, complete an investigation within 10 days of receiving a report; and

 (b) Complete the investigation within 60 days of receiving a report.

 (4) An investigation is complete when the local department or law enforcement:

 (a) Determines the nature, extent, and cause or causes of any injuries, sexual abuse, or neglect;

 (b) Determines if evidence is present to identify an alleged abuser or neglector;

 (c) Determines the names, ages, and conditions of other children in the household or in the care or custody of an alleged abuser or neglector;

was not deprived of her right to appeal; and (3) appellant suffered no prejudice.

Many Maryland appellate decisions have wrestled with the meaning and effect of the word "shall" as used in various statutes. Judge Thomas Hunter Lowe, speaking for this Court in *Pope v. Secretary of Personnel,* 46 Md.App. 716, 420 A.2d 1017 (1980), provided a good summary of the case law as of 1980:

—the trend—

The word "shall" has probably occupied the erudition of the Court of Appeals more than any other single term. In recent years the Court of Appeals has with increasing rigidity applied the principle of statutory construction that use of the word "shall" is presumed mandatory. *Hirsch v. Dept. of Nat'l Resources,* 288 Md. 95, 416 A.2d 10 (1980); *In re James S.,* 286 Md. 702, 410 A.2d 586 (1980); *State v. Hicks,* 285 Md. 310, 403 A.2d 356 (1979); *Johnson v. State,* 282 Md. 314, 384 A.2d 709 (1978); *United States Coin & Currency v. Dir.,* 279 Md. 185, 367 A.2d 1243 (1977); *Moss v. Director,* 279 Md. 561, 369 A.2d 1011 (1977); *Bright v. Unsat. C. & J. Fund Bd.,* 275 Md. 165, 338 A.2d 248 (1975). A practical qualifying pressure valve—"unless the context of the statute would indicate otherwise"—is invariably adhered to a recitation of that principle. *See, e.g., Maryland St. Bar Ass'n v. Frank,* 272 Md. 528, 533, 325 A.2d 718 (1974); *Ginnavan v. Silverstone,* 246 Md. 500, 505, 229 A.2d 124 (1967).

_____

(d) Assesses the safety of all children in the care or custody of an alleged maltreator who may be at risk;

(e) Evaluates factors pertinent to the risk of future child abuse or neglect; and

(f) Determines what services, if any, are needed.

(5) If an assessment by other than the local department is necessary to determine the nature, extent, or cause of injury, sexual abuse, or neglect, and the assessment is not completed within 60 days, the local department may, with a supervisor's approval, complete the investigation with a pending finding until it receives the required assessment.

While the context of fewer and fewer statutes "indicate otherwise," one of the contextual factors relied upon, "thought not controlling," *to hold the use of "shall" directory is when a statute provides no penalty for failure to act within a prescribed time.* See *Maryland St. Bar Ass'n v. Frank, supra* at 533, 325 A.2d 718; *but see In re James S., supra.* The case law provides very little in the nature of when or how to prognosticate where the exception should overcome the presumption. *State v. Hicks,* for example, acknowledged a statute governing the assignment of criminal cases for trial in which the term "shall" was held to be directory in *Young v. State,* 266 Md. 438, 294 A.2d 467 (1972), for the reason that the Legislature had not explicitly provided the extreme sanction of dismissal for administrative noncompliance. 285 Md. at 316, 403 A.2d 356. By having enacted a rule using the identical language of the statute which also lacked explicit sanctions, the Court of Appeals decided in *Hicks* that in the context of its rule, "shall" was intended to be mandatory. *Id.*

There is, however, a thread of continuity in one line of cases perceived and commented upon by Judge Smith writing for the Court in *In re James S., supra.* Since 1908, the Court of Appeals has stood firmly upon the premise that Art. IV, § 15 of the Maryland Constitution is directory only when it admonishes that the Court of Appeals "shall" file its opinions within three months of argument. *McCall's Ferry Co. v. Price,* 108 Md. 96, 113, 69 A. 832 (1908). Similarly, a like provision for the circuit courts has been consistently interpreted as directory and not mandatory. *Maryland St. Bar Ass'n v. Hirsch,* 274 Md. 368, 374, 335 A.2d 108 (1975), *cert. denied,* 422 U.S. 1012, 95 S.Ct. 2638, 45 L.Ed.2d 676 (1975); *Davidson v. Katz,* 254 Md. 69, 78, 255 A.2d 49 (1969); *Pressley v. Warden,* 242 Md. 405, 406–407, 219 A.2d 25 (1966); *Myers v. State,* 218 Md. 49, 51, 145 A.2d 228 (1958), *cert. denied,* 359 U.S. 945, 79 S.Ct. 731, 3 L.Ed.2d 678 (1959); *Suttleman v. Bd. of Liq. Lic. Com'rs.,* 209 Md. 134, 140, 120 A.2d 388 (1956); *Snyder v. Cearfoss,* 186 Md. 360, 46 A.2d 607 (1946). These cases were discussed by

Judge Smith in *Resetar v. State Bd. of Education,* 284 Md. 537, 399 A.2d 225 (1979), while giving similar consideration to a county board of education mandate upon itself.

"The Board shall ... render a decision ... within thirty (30) days...."

The thread apparent in each of these cases which continued to digress from the contemporary trend, is that the directory duty imposed is on the "arbiter of the controversy" as opposed to the adversary. *In re James S., supra* at 708, 410 A.2d 586.

*Id.* at 717–18, 420 A.2d 1017 (footnotes omitted) (emphasis added).

More recently in *Woodfield v. West River Improvement Ass'n,* 395 Md. 377, 388–90, 910 A.2d 452 (2006), the Court of Appeals focused on the use of the word "shall" as used in Maryland Code (2005 Repl.Vol.), Article 2(B), section 16–101(e)(3). In *Woodfield,* the statute provided:

Unless extended by the court for good cause, the local licensing board's decision made under subsection (a) of this section *shall* be affirmed, modified, or reversed by the circuit court within 90 days after the record has been filed in the court by the local licensing board.

(Emphasis added).

In *Woodfield,* Judge Wilner, speaking for the Court, said: We shall consider first the issue of whether the circuit court lost jurisdiction or authority to render a decision once the 90–day period specified in § 16–101(e)(3) of Art. 2B expired. As an alternative ground for holding that authority was not lost, a majority of the Court of Special Appeals concluded that the statute was "directory" rather than "mandatory." We shall not decide the issue precisely on that basis, because, though certainly traditional, *the mandatory/directory approach to determining the consequences of a failure to comply with a statutory command is an artificial one that addresses the appropriate question in a circular fashion.* In *Tucker v. State,* 89 Md.App. 295, 297–98, 598 A.2d 479 (1991), which dealt with a somewhat similar matter—the

failure of a judicial panel to render a decision within the time set in a statute—the Court of Special Appeals observed:

"In dealing with statutory commands, including time provisions such as these, courts often speak in terms of whether they are 'mandatory' or merely 'directory'. . . . The suggestion implicit from such an analysis is that, if the command is 'mandatory,' some fairly drastic sanction must be imposed upon a finding of noncompliance, whereas if the command is 'directory,' noncompliance, will result in some lesser penalty, or perhaps no penalty at all. That, indeed, is really the issue. When a legislative body commands that something be done, using words such as 'shall' or 'must,' rather than 'may' or 'should,' we must assume, absent some evidence to the contrary, that it was serious and that it meant for the thing to be done in the manner it directed. In that sense, the obligation to comply with the statute (or rule) is both mandatory and directory. *The relevant question in such a case is whether the sanction sought for noncompliance is an appropriate one.*" *See also Thanos v. State,* 332 Md. 511, 522, 632 A.2d 768 (1993); *State v. Green,* 367 Md. 61, 82, 785 A.2d 1275 (2001); *Gorge v. State,* 386 Md. 600, 613, 873 A.2d 1171 (2005), quoting with approval from *Tucker.*

The *Tucker* Court noted that this Court had essentially adopted that view, with respect to commands found in the Maryland Rules, in its promulgation of Maryland Rule 1–201. The court observed that, although Rule 1–201(a) applies only to the construction of the Maryland Rules, the standards espoused in it are equally applicable to statutory commands, and that "[e]ven when applying a 'mandatory/directory' standard, the *courts have essentially looked to the context of the enactment and ultimately to the legislative intent in determinating what, if any, sanction to impose for noncompliance.*" *Tucker v. State, supra,* 89 Md.App. at 298, 598 A.2d at 481. Thus, "[i]f the legislative body has provided a sanction for noncompliance, its intent is clear, and that sanction, if lawful, i.e., constitutional, has ordinarily

been applied[,]" but "[i]f no clear sanction has been provided, *the court has attempted to discern the overall purpose of the statute and then determine which, if any, sanction will best further that purpose."*

*Id.* at 388–89, 910 A.2d 452 (footnote omitted) (emphasis added).

■ Similar to the situation presented in *Woodfield,* in the case *sub judice,* the statute at issue does not provide a sanction for noncompliance with the 60 day requirement. Therefore, we shall look to the overall purpose of the statute to determine whether dismissal would further the statute's purpose. *Id.*

Section 5–706 of the Family Law Article is found under subtitle 7, which is entitled Child Abuse and Neglect. Section 5–702, which sets forth the legislative policy and the purpose of subtitle 7, reads as follows:

The purpose of this subtitle *is to protect children who have been the subject of abuse or neglect* by:

(1) mandating the reporting of any suspected abuse or neglect;

(2) giving immunity to any individual who reports, in good faith, a suspected incident of abuse or neglect;

(3) *requiring prompt investigation of each reported suspected incident of abuse or neglect;*

(4) causing immediate, cooperative efforts by the responsible agencies on behalf of children who have been the subject of reports of abuse or neglect; and

(5) requiring each local department to give the appropriate service in the best interest of the abused or neglected child.

The expressed purpose of the 60 day provisions set forth in FL § 5–706(g)(2) is to protect children by attempting to ensure that after a report of neglect or abuse comes to the attention of the Department, more then 60 days should not elapse before a report is completed by the Department. Nothing in the subtitle indicates that its purpose is to protect

persons charged with neglect or abuse. Instead, as stated in section 5–702, the purpose is to protect neglect and abuse victims. This last point was emphasized in *Horridge v. St. Mary's County Department of Social Services*, 382 Md., 170, 854 A.2d 1232, (2004) where the Court said:

The duties imposed on DSS by FL § 5–706 and the implementing regulations of the Department of Human Resources ... require a prompt investigation of *each* reported incident of child abuse. The duty to act is mandatory; the steps to be taken are clearly delineated; and, *most important, the statute makes clear in several places that the sole and specific objective of the requirement is the protection of a specific class of children-those identified in or identifiable from specific reports made to DSS and those also found in the home or in the care or custody of the alleged abuser.* This is not an obligation that runs to everyone in general and no one in particular. It runs to an identified or identifiable child or discrete group of children.

(Emphasis added).

The Department bolsters its argument that dismissal is an inappropriate sanction by accurately setting forth the relevant legislative history of FL § 5–706(g), as follows:

In 1966, the General Assembly first legislated a ten-day timeframe for local departments to complete child abuse investigations. The stated purpose of this legislation was to ensure that there would be no delays in the local welfare department providing services, including petitioning the Court to remove the child from his or her home, based on the findings. *See* 1966 Laws of Maryland ch. 221. The law provided no appeal rights, and thus could not have been enacted to confer procedural rights on appellants.

In 1986, when the legislature extended the timeframe for making a final report to sixty days (thirty days with a possible thirty-day extension), it did so to "allow investigators to complete full and accurate reports regarding *child abuse investigations.*" *See* 1986 Laws of Maryland ch. 200; Senate Judiciary Proceedings Committee, Summary of

Committee Report on HB 390 at p. 2. Delegate Hixon, who introduced the bill, noted that "HB 390 *will require the reporting agency to give immediate and continued attention to each case, but allow them the necessary time to complete a thorough and accurate report.*" She noted the "tragedy" of child abuse and neglect in Maryland, stating that HB 390, while addressing just one aspect of the problem, was "a step in the right direction." Testimony on HB 390 at 2. *In 1987, the timeframes were made applicable to investigations of child neglect as well as child abuse.* 1987 Laws of Maryland ch. 635 at pp. 2950–2951.

(Emphasis added.)

Insofar as it concerns legislative history, Mrs. Owens' brief is also accurate when she states:

In 1987, Senate Bill 708 consolidated the Child abuse and Child neglect subtitles into one new subtitle, "Subtitle 7. Child Abuse and Neglect." *See* 1987 Md. Laws, ch. 635. The purpose for the consolidation was twofold. First, the consolidation was to "bring the obligations imposed upon both professionals and nonprofessionals to report suspected instances of Child abuse and neglect into *parity.*" *See* Senate Judicial Proceedings Committee: Bill Analysis, Senate Bill 708, p. 3. Second, the Maryland Senate wanted to change the previous direction to local departments to "promptly and thoroughly investigate reports of suspected neglect," and replace it with the specific requirements as applied to investigations of suspected abuse. The new Subtitle 7 included section 5–706, investigations.

Addressing the legislative intent of section 5–706(g)(2), appellant's argument, in a nutshell, is as follows: inasmuch as the General Assembly used the word "shall" in regard to the time limit for the completion, by the Department, of its investigation of child abuse and neglect, the General Assembly must have intended that dismissal was the appropriate sanction for noncompliance. In support of this argument, appellant cites only two cases: *In re James S.,* 286 Md. 702, 410

A.2d 586 (1980) and *State v. Hicks*, 285 Md. 310, 403 A.2d 356 (1979).

In *State v. Hicks*, the Court of Appeals was required to interpret Maryland Rule 746, which required that "a trial date shall be set no later then 120 days after the appearance or waiver of counsel or after the appearance of defendant before the court." 285 Md. at 312, 403 A.2d 356. The rule did not provide a sanction for noncompliance. *Id.* The Court of Appeals held in *Hicks* that the time requirements in Rule 746 were mandatory and required dismissal of the charges for noncompliance, in the absence of an expressed waiver by the defendant or extraordinary good cause found by the court. *Id.* at 317–18, 403 A.2d 356. In reaching this conclusion, the Court examined the purpose of the rule and concluded that it was "intended to ... put teeth into a new [statute] governing the assignment of criminal cases for trial." *Id.* at 318, 403 A.2d 356.

In *In re James S., supra*, the Court of Appeals examined a provision of the Juvenile Delinquency Act requiring that a delinquency petition "shall be filed within 15 days after the receipt of a referral from the intake officer." 286 Md. at 703, 410 A.2d 586. Notwithstanding the absence of a sanction in the statute, the Court held that failure to meet the 15 day deadline required the sanction of dismissal of the petition. *Id.* at 713–14, 410 A.2d 586. The Court of Appeals reached its decision after noting the similarity of the operative words of the statute to those of many statutes of limitations set forth in the Courts and Judicial Proceedings Article. In light of the aforementioned similarity in language, the Court said: "No one would contend seriously that the language of these limitations statutes is directory rather then mandatory." *Id.* at 712, 410 A.2d 586.

In the case of *In re Keith W.*, 310 Md. 99, 527 A.2d 35 (1987), the Court dealt with the requirements of Maryland Rule 914, which read:

An adjudicatory hearing shall be held within sixty days after the juvenile petition is served on the respondent unless

a waiver petition is filed, in which case an adjudicatory hearing *shall be held within thirty days after the court's decision to retain jurisdiction at the conclusion of the waiver hearing.* However, upon motion made on the record within these time limits by the petitioner or the respondent, the administrative judge of the county or a judge designated by him, for extraordinary cause shown, may extend the time within which the adjudicatory hearing may be held. The judge shall state on the record the cause which requires an extension and specify the number of days of the extension.

*Id.* at 101–02, 527 A.2d 35.

Keith W., a juvenile, was charged with drug offenses but was not tried within the time limits set forth in Rule 914. *Id.* at 102, 527 A.2d 35. Keith W. moved for dismissal of the juvenile petition. The motion was denied. *Id.*

The *In re Keith W.* Court commenced its discussion by acknowledging that the language of Rule 914 and the rule at issue in *Hicks* contained nearly "identical language." *Id.* at 103, 527 A.2d 35. The Court added, however, that "it did not necessarily follow that a violation of each rule justifies an identical sanction." *Id.* at 103–06, 527 A.2d 35.

The Court distinguished its earlier *In re James S.* decision in the following manner: viz:

Our decision in *James S.* is entirely consistent with our line of decisions that have looked to a statute's or rule's function or purpose to determine whether dismissal was an appropriate sanction for a violation thereof. When we reviewed § 3–812(b) in *James S.,* we were "struck by the similarity between the language used in [§ 3–812(b) ] and that [used] in the various limitations of actions found in Code (1974, 1979 Cum.Supp.) Title 6, Subtitle 1, Courts and Judicial Proceedings Article." *Id.* at 711, 410 A.2d 586. Accordingly, we concluded that § 3–812(b) was like any other statute of limitations and dismissal with prejudice was the required sanction when the statute's time limitations were not met. *Id.* at 713, 410 A.2d 586. *Clearly, Rule 914*

*is not a statute of limitations and, thus, James S. is inapposite.*

*Id.* at 108, 527 A.2d 35 (emphasis added).

The cases relied upon by Mrs. Owens can be distinguished on the same grounds as those set forth in *In re Keith W.* The purpose of subtitle 7 is to protect children—not to protect persons alleged to have neglected or abused children. That purpose will not be served by dismissing charges in cases where the Department fails to complete its investigation within 60 days. Section 5–706(g) does not deal with the date for commencement of proceedings against the person alleged to have abused or neglected a child. Such proceedings are commenced pursuant to FL § 5–706.1. Therefore, it is clear that section 5–706(g) is not worded like a "statute of limitations", as was the case in *In re James S.*

Lastly, we note that if the result advocated by appellant were to be obtained, it would mean that no matter what abuse or neglect had been visited upon a minor child, the Department could not list the perpetrators in its registry if the investigation was not completed within 60 days. Such an interpretation would likely damage children-not protect them.

■ For the above reasons, we hold that the ALJ was correct when he ruled that dismissal of the allegation of abuse was not required as a sanction for the Department's failure to meet the 60 day requirement.[5]

---

**5.** Appellant devotes two sentences in her brief to a contention that her rights to due process of law were violated by the Department's failure to complete its investigation within 60–days. Appellant's argument is as follows:

If the mandatory time requirement provisions of § 5–706(g)(2) are simply ignored by the [Department], the due process rights of persons such as ... [Mrs. Owens] who are suspected of neglect are totally undermined.

Neither in the lower court nor in her brief filed with this Court did Mrs. Owens set forth any facts showing that she was in any way prejudiced by the delay in completing the investigation. Without injury, there can be no violation of one's rights to due process. Appellant does say in an earlier part of her brief, that the delay in completing the investigation, delayed, in turn, Mrs. Owens' "right to a timely adminis-

## III.

Appellant contends:

The Administrative Law Judge erred when concluding as a matter of law that [Mrs. Owens] had responsibility for the care, custody, and supervision of the Child and the Circuit Court compounded the error by affirming without explanation the ALJ's finding. Whether [Mrs. Owens] was a person who has permanent or temporary care or custody or responsibility for supervision of the Child is a question of law. Therefore, the reviewing court is not constrained to affirm the agency where its orders are premised solely upon an erroneous conclusion of law. *Ramsay, Scarlett & Co. v. Comptroller of the Treasury*, 302 Md. 825, 490 A.2d 1296 (1985).

■ Whether the circuit court should have given an explanation as to why it agrees with the ALJ has no significance in an administrative appeal like this one. Our job is to perform the same task as that performed by the circuit court. *See Tochterman v. Baltimore County*, 163 Md.App. 385, 404–05, 880 A.2d 1118 (2005).

■ The ALJ found that Mrs. Owens was guilty of neglect of Sandy. Neglect is defined in FL § 5–701(s) as follows:

(s) *Neglect.*—"Neglect" means the leaving of a child unattended or other failure to give proper care and attention to a child by any parent *or other person who has permanent or temporary care or custody or responsibility for supervision of the child* under circumstances that indicate:

(1) that the child's health or welfare is harmed or placed at substantial risk of harm; or

---

trative appeal...." and "thereby prevent[ed][her] from preparing an immediate defense." Assuming that is true that appellant was prevented "from preparing an immediate defense," Mrs. Owens does not provide us with even a hint as to how her defense to the Department's charges was in any way prejudiced.

(2) mental injury to the child or a substantial risk of mental injury.

(Emphasis added.)

In his written opinion, the ALJ said:

Undeniably, [Mrs. Owens] for whatever reason, voluntarily went to North Carolina during 1999, and brought Sandy to Maryland to live with her ... family. *The evidence is clear that [Mrs. Owens] at least for a two-year period, had permanent care and custody of Sandy.* As demonstrated by [Mrs. Owens'] integration of Sandy into her home by providing her food, shelter, and clothing. Additionally, [Mrs. Owens] secured the necessary documents and enrolled Sandy in the Prince George's County public school system. Clearly, [Mrs. Owens] made a commitment to care for and raise Sandy. Additionally, in view of the [a]ppellant's care of Sandy subsequent to 1999, her argument that Sandy's mother, who barely knows the child, is the responsible parent, is also unconvincing.

(Emphasis added.)

The facts relied upon by the ALJ were all supported by substantial evidence. Mrs. Owens does not argue otherwise. Instead, she argues:

The ALJ did not cite legal authority for how the three (3) factors attributed to the Petitioner caused her to have *responsibility* for the care, custody and supervision of the child as compared to the Natural Mother. The failure to cite legal authority by the ALJ constitutes a prima facie failure to apply the applicable law because Maryland appellate courts have consistently held that the natural or biological parent has the presumptive right, and by way of implication, a presumptive responsibility as compared to any third party that cannot be challenged unless there is an initial finding that the natural or biological parent is unfit. (*See McDermott v. Dougherty,* 385 Md. 320, 869 A.2d 751 (2005) and *Tedesco v. Tedesco,* 111 Md.App. 648, 683 A.2d 1133 (1996)). In the instant case neither the Worker nor the ALJ even attempted to address the presumed fitness of the

Natural Mother, but rather chose to simply endorse the Natural Mother's rejection of her daughter so as to avoid any change in the mother's lifestyle. This unexplained acquiescence obviated the legal responsibility that presumptively obligates a natural parent to provide care, custody, and supervision to their child.

Neither of the cases cited by appellant are apposite. Both *McDermott v. Dougherty,* 385 Md. 320, 869 A.2d 751 (2005), and *Tedesco v. Tedesco,* 111 Md.App. 648, 683 A.2d 1133 (1996), are child custody cases. Neither case has anything to do with a case like this one where a relative voluntarily assumed responsibility for the care of a child when the natural parents were unwilling (like Sandy's mother) or unable (like Sandy's father) to provide care.

We fail to see why it was necessary for the ALJ to cite "legal authority" for his determination. The ALJ read the statute and reached the conclusion that appellant had assumed responsibility for Sandy's care based on undisputed facts. The undisputed facts showed that appellant had undertaken responsibility for Sandy's care for a period of almost two years. Appellant took Sandy into her home and treated her like a daughter, obtained permission from Sandy's father to enroll her in Prince George's County schools, cared for Sandy, attempted to discipline her, and made arrangements with governmental authorities to provide her with money for the care of Sandy and Sandy's infant daughter.

Appellant stresses that she was a "modern day good Samaritan" who had no "legal responsibility" to perform the good work she undertook. It is certainly true that prior to December, 1999, appellant had no legal responsibility to take Sandy into her home and care for her. But by her actions she voluntarily assumed that responsibility. *See* footnote 1, *supra.*

For the aforegoing reasons we hold that the ALJ did not err when he found that in September 2001 appellant was responsible for the care of Sandy.

**54**

### IV.

 Appellant next argues:

The ALJ made a finding of fact that in early September 2001, the Petitioner's Husband ordered Sandy to leave the home, and would not allow Sandy to return to the home. The ALJ also found that the Petitioner concurred with her Husband's action. The Circuit Court affirmed again without explanation these [sic] Findings of the ALJ.

After reviewing the record, specifically the testimony of the Petitioner and her Husband, it is clear that these findings are not supported by substantial evidence.

This argument is without merit. As mentioned earlier, Mr. Emecheta testified that both Mr. and Mrs. Owens told him that they had "kicked" Sandy out of the house. Moreover, according to Mr. Emecheta's unobjected-to testimony, when he talked to Sandy and to Ms. Latamore, they both told him the same story.

It is true that the testimony of Mrs. Owens and her husband contradicted Mr. Emecheta's testimony inasmuch as they denied having evicted Sandy from their home. But, self-evidently, it was the ALJ's prerogative to evaluate the credibility of the witness. He evidently believed Mr. Emecheta and disbelieved the Owens in this regard. Under such circumstances, the ALJ's finding that appellant had "kicked out" Sandy from her home and refused to provide for her needs was supported by substantial evidence.

### CONCLUSION

The outcome of this case is regrettable. It certainly appears that Mrs. Owens tried her best to help her niece become a law abiding citizen but, through no fault on her part, could not convince Sandy to abide by the (quite reasonable) rules of the Owens' household. If we were the fact-finders, it is entirely possible that we would have reached a result different from the one arrived at by the ALJ. But we, as appellate judges, do not find facts or evaluate the credibility of witnesses. Instead, our job, in cases like this one, is to: (1)

review the evidence presented to the ALJ and determine whether there was substantial evidence to support the ALJ's factual findings; and (2) decide whether the ALJ committed legal error. Using that criteria, we shall affirm.

**JUDGMENT AFFIRMED;**

**COSTS TO BE PAID BY APPELLANT.**